# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 02-4292, 03-1115

NOURAIN B. NIAM,

*Petitioner,*

and

PETER BLAGOEV, IORDANKA KISSIOVA, and
IANA KISSIOVA,

*Petitioners,*

*v.*

JOHN ASHCROFT, Attorney General of the United States,

*Respondent.*

_____

Petitions for Review of Orders of the
Board of Immigration Appeals.
Nos. A76-860-107; A75-308-785, -925, -926.

_____

ARGUED NOVEMBER 13, 2003—DECIDED JANUARY 7, 2004

_____

Before POSNER, RIPPLE, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. We have consolidated for decision two petitions to review decisions by the Board of Immigration Appeals denying asylum. The petitions raise different issues, but are related in suggesting, together with

other recent cases in this and other circuits, see, e.g. *Georgis v. Ashcroft*, 328 F.3d 962, 968-70 (7th Cir. 2003); *Kerciku v. INS*, 314 F.3d 913, 918-19 (7th Cir. 2003) (per curiam); *Begzatowski v. INS*, 278 F.3d 665, 670-71 (7th Cir. 2002); *Mansour v. INS*, 230 F.3d 902, 908-09 (7th Cir. 2000); *Vujisic v. INS*, 224 F.3d 578, 581 (7th Cir. 2000); *Chitay-Pirir v. INS*, 169 F.3d 1079, 1081 (7th Cir. 1999); *Secaida-Rosales v. INS*, 331 F.3d 297, 312 (2d Cir. 2003); *Hernandez v. Reno*, 258 F.3d 806, 813-14 (8th Cir. 2001); *Reyes-Melendez v. INS*, 342 F.3d 1001, 1008 (9th Cir. 2003), a pattern of serious misapplications by the board and the immigration judges of elementary principles of adjudication. In *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000), we stated forthrightly: "the Board's analysis was woefully inadequate, indicating that it has not taken to heart previous judicial criticisms of its performance in asylum cases [citing cases]. The elementary principles of administrative law, the rules of logic, and common sense seem to have eluded the Board in this as in other cases."

We begin with Niam, who was an official of the government of Sudan when it was controlled by the Umma Party. The Umma regime was overthrown in 1989 by Omar al-Bashir. Niam was promptly fired and the following year was arrested and detained for three and a half weeks, during which he was questioned to the accompaniment of death threats, slaps, and kicks. He was released after agreeing to tell the authorities if he left town; but without telling them he fled to Egypt and then to Chad, where Sudanese exiles had reconstituted the Umma Party. The Party's leaders persuaded Niam to agree to return to Sudan and act as a spy for the Party and help members escape. But when he entered Sudan from Chad he was apprehended by Sudanese border police. They took his passport and directed him to follow them to an office where he could retrieve it. He demurred and they let him return to Chad, but without the passport. He left Chad for Nigeria, later returned to Chad,

and then went back to Nigeria. But when he learned that a Sudanese security officer had come to the Nigerian town where he lived, asking questions about him, he managed (using a new Chadian passport) to obtain a visa to study in the United States. Once here, however, he didn't enroll in school, and so was ordered removed (deported).

Because he hadn't requested asylum within a year of arriving in the United States (missing the deadline by 19 days), he was ineligible for asylum. 8 U.S.C. § 1158(a)(2)(B); 8 C.F.R. § 208.4(a)(2); *Castellano-Chacon v. INS*, 341 F.3d 533 (6th Cir. 2003). But he was eligible to request withholding of removal. "[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3); see *Tarawally v. Ashcroft*, 338 F.3d 180, 185-86 (3d Cir. 2003). But to obtain that relief Niam had to show a "clear probability" that he would be persecuted if he returned to Sudan. *INS v. Stevic*, 467 U.S. 407, 430 (1984); *Tesfu v. Ashcroft*, 322 F.3d 477, 481 (7th Cir. 2003). The immigration judge ruled that Niam hadn't proved this and so turned down his request, and the Board of Immigration Appeals affirmed.

The immigration judge's analysis was so inadequate as to raise questions of adjudicative competence. The first point he made in support of his refusal to grant withholding of removal was that there had been a regime change since Niam's being fired, arrested, detained, and beaten, so Niam has nothing to fear should he return to Sudan. There has been no regime change; Omar al-Bashir remains in power. Next the immigration judge said that "there is no evidence of recriminations following [Niam's] attempted reentry to Sudan." The choice of the word "recriminations" is peculiar.

If what the immigration judge meant was that the Sudanese government did not react to Niam's attempted reentry, it is another factual error, since it was after the attempted reentry that Sudanese security was asking questions about Niam in Nigeria. Maybe what the immigration judge meant by "no evidence of recriminations" was that the border police who seized Niam when he reentered the Sudan let him return to Chad rather than dragging him off to prison, but the immigration judge didn't say that; nor is there any suggestion that the border police had access to a database listing all members of the Umma Party or all officials of the former regime.

The immigration judge also latched onto Niam's statement that the Bashir regime was not interested in him "personally"—Niam acknowledged that he had been only a minor official—but rather was targeting all members of opposition parties. The immigration judge said there was no evidence of this. He was again wrong. The State Department's 1998 Sudan country report stated that the Bashir regime has a practice of routinely persecuting political opponents: "Government forces regularly tortured, beat, harassed, arbitrarily arrested, and detained opponents or suspected opponents of the Government with impunity." And two members of the Umma Party, both Sudanese who had been granted asylum in the United States, testified that Niam would still be targeted by the Bashir regime as a political opponent even after an 11-year absence—that he would be "arrested at the airport or on the borders" and "disappear" for a long time.

The immigration judge stated that "even if it were established that the government persecutes all opposition party members, [Niam] admitted that he has not been active in the Omma [*sic*] Party since his arrival in the United States." This is a non sequitur. If the regime is after *all* opposition party

members, it is irrelevant whether a member of an opposition party is active, especially when he's in a foreign country. Moreover, Niam didn't come to the U.S. until 1996 and for some and maybe all of the seven preceding years since he had left Sudan he had been active in the affairs of the Umma Party. Remember that the Party had sent him back to Sudan to spy for it. Furthermore, Niam attended graduate school in Nigeria during this period with financial assistance from the Party.

Finally, the immigration judge thought it significant that Niam's remaining relatives in Sudan had not been persecuted. However, those relatives are women, who were never active in political affairs. Niam's two brothers, who were, also fled the country. The immigration judge did not discuss the distinction. His analysis flatly failed to engage with the evidence presented to him.

On Niam's appeal from the immigration judge's decision, the Board of Immigration Appeals noted that the immigration judge had "incorrectly identified the regime in power in Sudan during his 1990 arrest." But the board declared the error "harmless," without, however, explanation. So far as appears, the board did not notice any of the immigration judge's other errors.

When the board writes an opinion, the opinion becomes the basis for judicial review of the decision of which the alien is complaining. *INS v. Ventura*, 537 U.S. 12, 15 (2002) (per curiam); *Begzatowski v. INS, supra*, 278 F.3d at 669 n. 5. When as in this case the board's opinion merely supplements the immigration judge's opinion, the latter opinion as supplemented by the board's opinion becomes the basis for review. *Angoucheva v. INS*, 106 F.3d 781, 788-89 (7th Cir. 1997) (per curiam); *Krouchevski v. Ashcroft*, 344 F.3d 670, 671 (7th Cir. 2003). So it's as if the immigration judge, after writing his opinion, had, perhaps in response to a motion

for reconsideration, discovered his error about the regime, acknowledged it, but pronounced it harmless. Cf. Fed. R. Civ. P. 59(e); *Russell v. Delco Remy Division of General Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995); *Charles v. Daley*, 799 F.2d 343, 348 (7th Cir. 1986). The difficulty with applying the analogy to this case is that the remainder of the immigration judge's opinion is riven with errors as well, as we have seen, and these were not noticed by the board and so the board's conclusion that the one error it did catch was harmless does not validate the immigration judge's decision to deny Niam relief.

Sudan's terrible human rights record—see, e.g., U.S. State Department, *Report on Human Rights Practices in Sudan* (2002); Human Rights Watch, *World Report for Sudan* (2003), http://www.hrw.org/wr2k3/africa12.html; Amnesty International, *Sudan: No Impunity for Torturers*, Sept. 2003, http://web.amnesty.org/library/Index; Sudan Peace Act, Pub. L. No. 107-245, 116 Stat. 1504 (2002), 50 U.S.C. § 1701 ("the acts of the Government of Sudan . . . constitute genocide . . . [and] Congress hereby condemns . . . the Government of Sudan's overall human rights record")—which the immigration judge acknowledged, suggests that Niam is likely to be persecuted should he return to Sudan. For once the Sudanese authorities discover who he is, they will realize that he violated the terms of his 1990 release, they will in all likelihood take him in for questioning, and, given the methods that Sudanese interrogators use, they will no doubt elicit a confession that he tried to reenter Sudan to spy for the Umma Party. One can easily imagine the sequel to such a confession. Is the probability of persecution "clear"? That is for the immigration authorities to decide in the first instance in a proceeding free from the errors of the immigration judge that, taken as a whole, deprive the order of removal of a rational basis. The order must be vacated

and the case returned to the immigration service for further proceedings consistent with this opinion.

Our second case involves Peter Blagoev, a professional musician in Chicago who, accompanied by his wife and his stepdaughter, was admitted to the United States from Bulgaria on a student visa in 1993, the wife and stepdaughter being admitted as visitors. All three overstayed (and Blagoev like Niam failed to attend school), concede their removability, and seek asylum, which was denied by an immigration judge in an order that the Board of Immigration Appeals affirmed without opinion.

Blagoev comes from a prominent anticommunist family. The communists sentenced his grandfather to death when they took power in Bulgaria in 1944, although the sentence was not carried out. Blagoev's father was also persecuted by the communist regime, and an attack on his home with acetone, a powerful corrosive chemical, caused permanent injury to Blagoev's mother. As for Blagoev himself, he was first beaten in the basement of the local police station when at age 16 he asked a guest lecturer at his school "how come . . . if it's so nice here everybody is trying to get out of here and go West." For this impertinence he was also expelled from the communist youth organization (which he had been required to join) and suspended from school for a year. Later, when drafted into the Bulgarian army, he was beaten repeatedly by fellow soldiers because of his family's anticommunist reputation. He states rather improbably (but the immigration accepted as true) that he was discriminatorily denied protective clothing when radioactive clouds from the Chernobyl disaster wafted toward Bulgaria. After completing his military service he got a series of music jobs but was fired from each after expressing his political views; on one occasion he was severely beaten in the communist party headquarters, losing a tooth. After the collapse of the

communist regime in 1989, Blagoev publicly advocated the restoration of the monarchy. This was an unpopular stand, especially among the numerous ex-communists, that garnered death threats against his family. His wife, who was active in the same causes as he, was assaulted, and her cousin was murdered after filing a claim to recover land that had been stolen from him by the communists. When an attempt was made to abduct Blagoev's stepdaughter, the family had had enough and left the country.

Ordinarily a person persecuted by a regime that later collapses does not have a well-founded fear that he will be persecuted should he return, and so asylum is denied. E.g., *Useinovic v. INS*, 313 F.3d 1025, 1032 (7th Cir. 2002); *Bereza v. INS*, 115 F.3d 468, 474 (7th Cir. 1997); *Vaduva v. INS*, 131 F.3d 689, 692 (7th Cir. 1997); *Marcu v. INS*, 147 F.3d 1078, 1081-82 (9th Cir. 1998). But there are collapses and then there are collapses. Though some of our cases speak favorably of the political changes in Bulgaria since the collapse of the communist regime, see *Toptchev v. INS*, 295 F.3d 714, 723 (7th Cir. 2002); *Gramatikov v. INS*, 128 F.3d 619 (7th Cir. 1997); *Mitev v. INS*, 67 F.3d 1325, 1332 (7th Cir. 1995); see also *Kratchmarov v. Heston*, 172 F.3d 551, 554 (8th Cir. 1999)—and there has doubtless been improvement—there is evidence that Bulgaria's former communist bigwigs, quickly recycled as socialists and now busy cosying up to the United States, retain significant power in Bulgaria, especially and quite relevantly over the security service, and continue to pursue the old vendettas against anticommunists, such as members of the Blagoev family. Robert D. Kaplan, "Hoods Against Democrats," *The Atlantic Monthly*, Dec. 1998, p. 32; U.S. State Department, *Report on Human Rights Practices in Bulgaria* (1998); "Bulgarian Police Use Force to Free Legislators Trapped by Protest," *N.Y. Times*, Jan. 12, 1997, p. 9; Jane Perlez, "Looted by Its Own Officials, Bulgaria Faces the Day of Economic Reckoning," *N.Y. Times*,

Oct. 28, 1996, p. A6; "Romania and Bulgaria: Those "South-Eastern Laggards," *Economist* (U.S. ed.), Oct. 19, 1996, p. 54; Jane Perlez, "Rogue 'Wrestlers' Have an Armlock on Bulgaria," *N.Y. Times*, Jan. 12, 1995, p. A4; R.C. Longworth, "Bulgaria, Romania Resist Pull of the West," *Chi. Trib.*, Oct. 10, 1994, p. 6. All these are documents in the administrative record, entitled to some though of course not conclusive weight.

In nevertheless denying the Blagoevs' petition for asylum, the immigration judge relied heavily on U.S. State Department, *Profile of Asylum Claims and Country Conditions for Bulgaria* 3 (1997), where we read that "political conditions have so altered in the past eight years as to remove any presumption that past mistreatment under the Communists will lead to future difficulties" for people (like the Blagoevs) who had given the communist regime a hard time. (An "Asylum Profile" appears to be similar to a country report.) The immigration judge concluded that the Blagoevs had no well-founded fear of persecution should they be returned to Bulgaria. In addition he found that they hadn't suffered persecution, just "harassment," and so their claim didn't get to first base.

In Niam's case we saw the immigration judge commit a series mainly of factual errors. In the Blagoevs' case we encounter startling omissions plus a striking non sequitur. In discussing evidence of past persecution the immigration judge mentioned only Blagoev's expulsion from high school, political discrimination against him in employment, the clouds from Chernobyl (actually the least plausible of Blagoev's allegations, yet believed by the immigration judge), and other, but unspecified, "harassment" by Blagoev's fellow soldiers—"terrible," the immigration judge called it, but, inexplicably, not terrible enough to amount to persecution. All the other evidence of persecution, which we summarized earlier, simply went unmen-

tioned. Some of the persecution may have been entirely private, as in such cases as *Ghaly v. INS*, 58 F.3d 1425, 1430-31 (9th Cir. 1995), and *Adebisi v. INS*, 952 F.2d 910, 913-14 (5th Cir. 1992)—that is, neither condoned by the government nor enabled to flourish because of the government's lack of ability to control private conduct, unlike such cases as *Hengan v. INS*, 79 F.3d 60 (7th Cir. 1996); *Krastev v. INS*, 292 F.3d 1268, 1275 (10th Cir. 2002), and *Singh v. INS*, 134 F.3d 962, 967 n. 9 (9th Cir. 1998). But this is not argued.

Or maybe the evidence is false; but the immigration judge did not say that either, and the result is a yawning void in the opinion. Conceivably the evidence of persecution taken as a whole is outweighed by other evidence, but the only other evidence the immigration judge pointed to (besides the fact that Blagoev's father receives a tiny pension from Bulgaria and may have returned there) was that Blagoev had waited three years after the fall of the communist regime before he left Bulgaria. That was the non sequitur. For obviously an anticommunist does not leave his formerly communist country the day the communist regime falls. He expects improvement and only after it becomes clear that he will continue to be persecuted for his political beliefs by holdovers from the communist regime does he finally abandon hope of reform and leave.

The immigration judge's finding that the Blagoevs were not victims of persecution thus cannot be sustained. But if he reasonably found that they won't be persecuted if they return to Bulgaria, his decision must still be upheld. There was some evidence of this, namely the country report. We and other courts have expressed concern about the immigration service's chronic overreliance on such reports. The State Department naturally is reluctant to level harsh criticisms against regimes with which the United States has friendly relations. *Galina v. INS*, *supra*, 213 F.3d at 958; *Gramatikov v. INS*, *supra*, 128 F.3d at 620; *Vaduva v. INS*, *supra*, 131 F.3d at

691; *Manzoor v. United States Dept. of Justice*, 254 F.3d 342, 348 (1st Cir. 2001); *Shah v. INS*, 220 F.3d 1062, 1069-70 (9th Cir. 2000). The United States is not at all friendly to Sudan, which we bombed in 1998 and continue to designate as one of seven nations that sponsor terrorism, and the country report in Niam's case pulls no punches in describing the atrocities committed by the Sudanese regime. (For all we know, it *exaggerates* those atrocities—but this is not contended.) But we are very friendly with the former communist states of central and eastern Europe, and so the country report on Bulgaria can be expected to emphasize the bright side of Bulgarian politics.

Furthermore, the authors of these reports are anonymous and there is no opportunity for the asylum-seeker to cross-examine any of them. *Gailius v. INS*, 147 F.3d 34, 46 n. 7 (1st Cir. 1998); *Hosseinmardi v. INS*, 405 F.2d 25, 27 (9th Cir. 1968). That doesn't make the reports inadmissible as evidence. They have the status of official reports, which are admissible in a regular trial even though they are hearsay, Fed. R. Evid. 803(8)(C); *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000), and anyway administrative agencies are not bound by the hearsay rule or any other of the conventional rules of evidence, but only by the looser standard of due process of law. *Rosendo-Ramirez v. INS*, 32 F.3d 1085, 1088 (7th Cir. 1994); *Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 823 (9th Cir. 2003); *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 406 (3d Cir. 2003); *Felzcerek v. INS*, 75 F.3d 112, 116 (2d Cir. 1996); *Bustos-Torres v. INS*, 898 F.2d 1053, 1056 (5th Cir. 1990). Nevertheless the evidentiary infirmities of the country reports are important in placing in perspective a startling evidentiary ruling of which the Blagoevs complain.

The Blagoevs submitted the curriculum vitae and a sworn statement of Juliet Ellen Johnson, an assistant professor of political science at Loyola University in Chicago. Dr. Johnson (she has a Ph.D. in politics from Princeton) is a

specialist in the politics of Russia and the other formerly communist countries of central and eastern Europe. Her affidavit explains that "Bulgaria has undergone much less political and economic reform than other Eastern European countries, resulting in correspondingly greater official and semi-official violations of human rights." In particular, the security service is run by mostly the same people who ran it under the communist regime, and there is no control over the service by parliament. The service is very wealthy, and controls a number of firms, and it was employees of one of these who killed Mrs. Blagoev's cousin. Arbitrary arrests and detainment, police torture, and other gross abuses are common. Dr. Johnson's affidavit concludes with a summary of published reports on which she relied.

When the hearing before the immigration judge was held, Dr. Johnson was in Prague, and the Blagoevs' lawyer suggested that she be permitted to testify by phone. The immigration judge had already ruled that she could testify by phone from Dartmouth, where she was then teaching, if she didn't want to come to Chicago. But when he discovered that she was abroad, he forbade her to testify by telephone. This is one of the odder rulings in our experience. Prague does have phone service after all, and in fact the phone service between Prague and Chicago is quite comparable in acoustic quality and other relevant quality dimensions to the phone service between Hanover, New Hampshire and Chicago; nor did the immigration judge or anyone else suggest otherwise. So we're baffled. There was still Johnson's affidavit. But the immigration service's lawyer, noticing in Johnson's c.v. that almost all her publications are about Russia, with specific reference to banking, moved the immigration judge to exclude the affidavit on the ground that she was unqualified to give an expert opinion on Bulgarian politics. The judge granted the motion,

apparently because he couldn't voir dire Johnson since she was not present and was deemed unavailable telephonically.

Although the service's lawyer was entitled to question Dr. Johnson's qualifications, her curriculum vitae did not show on its face that she was unqualified to give an expert opinion concerning political conditions in Bulgaria. Apparently both the service's lawyer and the immigration judge overlooked the statement in her affidavit that "I regularly teach a course in Eastern European Politics, including a week on Bulgarian politics. I have been following Bulgarian politics on an almost daily basis since 1993." American academic interest in Bulgaria is limited, and it may be difficult to find competent scholars who make postcommunist Bulgarian politics the focus of their careers. There is no ironclad requirement that an academic, to be qualified as an expert witness, must publish academic books or articles on the precise subject matter of her testimony. *United States v. Langan*, 263 F.3d 613, 623 (6th Cir. 2001). Johnson is an expert on postcommunist central and eastern European politics, a field that encompasses the subject of her testimony, and she obviously is a student of Bulgarian politics and, judging from her affidavit that the judge refused to admit into evidence, a knowledgeable one.

The ground rules for qualifying expert witnesses in federal trials are given by the *Daubert* decision. But *Daubert* interprets Fed. R. Evid. 702, and the federal rules of evidence do not apply to the federal administrative agencies; so, strictly speaking, neither does *Daubert*. *Consolidation Coal Co. v. Director, Office of Workers' Compensation Programs*, 294 F.3d 885, 893 (7th Cir. 2002); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). But the spirit of *Daubert*, as *Donahue v. Barnhart*, *supra*, 279 F.3d at 446, and other cases, indicate, does apply to administrative proceedings. *Elliott v. Commod-*

*ity Futures Trading Comm'n*, 202 F.3d 926, 933 (7th Cir. 2000); *Libas, Ltd. v. United States*, 193 F.3d 1361, 1366 (Fed. Cir. 1999); see Paul S. Miller & Bert W. Rein, " 'Gatekeeping' Agency Reliance on Scientific and Technical Materials After *Daubert*: Ensuring Relevance and Reliability in the Administrative Process," 17 *Touro L. Rev.* 297 (2000). "Junk science" has no more place in administrative proceedings than in judicial ones. But it would be odd for an agency to adopt an even more stringent filter for expert testimony than that used by the courts for judicial proceedings, and there is no indication that the immigration service has done so. It would be particularly odd for that service to do so given the great weight that the immigration judges and the Board of Immigration Appeals give to the anonymous country and asylum reports.

And if this *were* a case governed by *Daubert*, the judge could not exclude Johnson on the basis of her affidavit and curriculum vitae without voir diring her, which could have been done over the phone. Not that a *Daubert* hearing is always required. *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998); *Target Market Publishing, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 n. 3 (7th Cir. 1998); *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001). But Johnson's affidavit was critical evidence and nothing in it or in her curriculum vitae showed that she was unqualified to give expert evidence in this case. The summary exclusion of the affidavit was arbitrary, *Elsayed Mukhtar v. California State University*, 299 F.3d 1053, 1064-66 (9th Cir. 2002); *In re Air Crash at Little Rock*, 291 F.3d 503, 514 (8th Cir. 2002); *Goebel v. Denver & Rio Grande Western R.R.*, 215 F.3d 1083, 1088 (10th Cir. 2000), but devastating in its consequences, and a denial of the Blagoevs' minimum procedural rights, as in *Kerciku v. INS*, *supra*, 314 F.3d at 917-18, and *Podio v. INS*, 153 F.3d 506, 509-11 (7th Cir. 1998); cf. *Gailius v. INS*, *supra*, 147 F.3d at 46 n. 7. So, like Niam's case, the Blagoevs' case

must be returned to the agency for further proceedings consistent with this opinion.

In view of the performance of these immigration judges and the criticisms of them that we have felt obligated to make, we urge the service to refer the cases to different immigration judges. *Georgis v. Ashcroft, supra,* 328 F.3d at 970; *Kerciku v. INS, supra,* 314 F.3d at 919.

A true Copy:

       Teste:

 

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*