UNPUBLISHED ORDER

Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued October 18, 2005
Decided December 9, 2005

**Before**

Hon. RICHARD A. POSNER, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 04-2472

| | |
|---|---|
| ERIKETA SIQECA, et al.,<br>     *Petitioners,*<br><br>  *v.*<br><br>ALBERTO R. GONZALES, United<br>States Attorney General<br>     *Respondent.* | On Petition for Review of an Order<br>of the Board of Immigration<br>Appeals<br><br>Nos. A77-655-901 & A77-655-902 |

**ORDER**

Eriketa Siqeca and her son, Xhemil, both Albanian citizens, applied for asylum, withholding of removal and protection under the Convention Against Torture after they attempted to enter the United States in April 2000 with fraudulent passports.  Siqeca claims that government officials threatened, beat and raped her because of her involvement in the Democratic Party ("DP").  The Immigration Judge ("IJ") denied her application, finding her testimony too inconsistent to be credible.  The Board of Immigration Appeals ("BIA") summarily

affirmed the IJ's decision, and Siqeca and her son seek review in this consolidated petition.[1] We affirm the decision of the BIA.

In her asylum application, Siqeca stated the following. Her husband was a leader of the DP in Albania until Socialists shot and killed him while on party business on June 8, 1991. In October 1998, police "grabbed" her at a rally at which she had given a speech. The officers "beat me on my back and head, forcing me to enter the [squad] car," and placed her in a cell alone. A masked police agent then beat her at the police station, warned her not to hold any more DP meetings and threatened to kill her if they picked her up again. After three hours, Siqeca was released and went to the DP headquarters to report the incident and take photographs of her injuries. She said she was "horribly frightened" because the police had known her by name.

Just one month later, Siqeca represented the DP as a poll watcher in the November 1998 elections. On her way to the voting center the secret police warned her that if she reported any abnormal activity, she would "end up like [her] husband." Nonetheless, after she noticed some people voting twice, Siqeca refused to sign a report stating the elections were "clean and honest," and instead signed a DP petition to sue the Socialist Party for "false elections."

On May 7, 1999, Siqeca received a notice to appear before the prosecutor in Tirana. When she arrived (the date is not specified in her affidavit), she said the prosecutor threatened her and asked her to withdraw her statement regarding the November 1998 elections. She refused, the prosecutor left the room, and a masked man entered who beat and raped her. Afterward, she was thrown out on the street. Once outside, she "walked slowly, sobbing, to a hospital" where she remained until 1:00 p.m. the next day. She then went to the DP offices to report her mistreatment and to take photos of her injuries. Soon, Siqeca began to receive threatening letters at home. Fed up, she finally moved her eldest children to her mother's house and left for the United States in April 2000 with her youngest son.

Three assertions in Siqeca's asylum application differed from the version she had offered to an immigration officer at her credible fear interview when she first entered the United States. First, at her interview she said she was raped at the prosecutor's office in August 1997. In her application, she said the rape occurred in 1999. Second, Siqeca told the officer that she had worked for the DP in the local election in June 1997; in her application she said the election was in November 1998. Third, Siqeca asserted at her interview that the government summoned her

---

[1] Eriketa Siqeca's son, Xhemil, bases his claim for relief on his mother's application.

in August 1997 and threatened her. In her application, she said the summons and threat occurred in June 1999.

Siqeca's story changed again when she testified before the IJ. First, Siqeca stated that after she had reported voting irregularities on the day of the November 1998 elections, the secret police picked her up and warned her against doing so. According to her interview statement, she did not report the voting irregularities at all because, the day *after* the election, a car full of masked men scared her. In her application she claimed that the secret police threatened her *before* the election.

Second, Siqeca testified that she had been raped on June 18, 1999 and not in August of 1997 as she had stated in her credible fear interview. She claimed that she had only been able to give approximate dates at her interview because she "did not have all the documents" with her at the time. Third, although Siqeca explained in her application that her rapist always wore a mask, at the hearing she described him as 35 years old with short, black hair and stated that "[s]imply by looking at his face, I realized that he was a criminal." When confronted with this inconsistency, she claimed he removed his mask on his way out, a claim she had not asserted in her application.

Finally, Siqeca gave a different account about what happened after her rape. At the hearing, she testified that she went first to the DP headquarters and that her brother then *drove* her to the hospital, which discharged her after four hours. This contradicted her application in which she reported that after the rape she *walked* directly to the hospital and was not discharged until 1:00 p.m. the following day, at which time she went to the DP offices.

During her hearing, Siqeca submitted a hospital discharge sheet and a medical report which stated that she was discharged on June 18, 1999, that her body and head were beaten, and that she suffered cuts, scratches and swollen tissues. The medical report did not mention rape. Siqeca submitted a letter from the DP dated November 16, 1998, appointing her as poll watcher for the November 22 election. Siqeca also submitted the four subpoenas regarding that election. The first subpoena was dated November 9, 1998, seven days prior to her appointment as poll watcher and thirteen days before the election occurred. Finally, she submitted her photos of June 18, 1999, the day of her hospital discharge.

Siqeca also submitted affidavits from two experts. The first was from Dr. Bernd J. Fischer, a professor of Balkan history. Dr. Fischer opined that Siqeca had established past and future persecution. He based his opinion on Siqeca's statements and "supporting documentation," which the IJ interpreted to mean her application and her hearing exhibits. The second affidavit was from Dr. Ahmad Bastani who diagnosed Siqeca as having had "Major Depression" for "several years,"

after evaluating her on December 5, 2002, three days after she had finished testifying before the IJ. According to Dr. Bastani's one-page assessment, Siqeca's symptoms included "[v]ery significant memory loss which has affected both short-term and long-term memory processes."

Where the BIA summarily affirms the IJ's decision denying relief, this court will evaluate the IJ's findings as if it were the BIA's. *Tolosa v. Ashcroft*, 384 F.3d 906 (7th Cir. 2004). This court will uphold an IJ's adverse credibility determination if it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Prela v. Ashcroft*, 394 F.3d 515, 518 (7th Cir. 2005) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). By contrast, this court will reverse only if it determines that the evidence "compels a different result" and that no reasonable factfinder could reach the same conclusion. *Id.* at 518.

Siqeca first challenges the IJ's finding that her testimony was not credible because of its inconsistencies. Relying on Dr. Bastani's affidavit, she also argues that depression-related memory loss sufficiently explains why she testified inconsistently. This court grants substantial deference to an IJ's adverse credibility finding provided that the IJ supported its credibility determination with "specific, cogent reasons" that "bear a legitimate nexus to the finding." *Lin v. Ashcroft*, 385 F.3d 748, 751 (7th Cir. 2004) (citations omitted). Furthermore, an IJ's adverse credibility finding must be based on discrepancies at the heart of the applicant's claim and cannot rest on minor inconsistencies. *Capric v. Ashcroft*, 355 F.3d 1075, 1090 (7th Cir. 2004). Finally, only where "extraordinary circumstances" warrant a reversal should a credibility finding be overturned; it is not enough to find that substantial evidence might support an alternate finding. *Id.* at 1086-87.

The IJ's adverse credibility finding is supported by "specific, cogent reasons." First, Siqeca's testimony regarding her alleged rape was inconsistent and went to the heart of her claim. Of the numerous inconsistencies the IJ noted, he was most troubled by the two month and two year difference between her answers to when her rape occurred (August 1997 versus June 1999). Siqeca's explanation that without "documents" she could only "approximate" the date of her rape is not credible because 1997 is not an approximation of 1999. The IJ was also troubled by Siqeca's varying statements regarding whether her rapist always wore a mask, whether after the rape she walked to the hospital alone or got a ride from her brother, whether after the rape she first went to the DP headquarters or to the hospital, and whether she was discharged from the hospital the same day of the rape or stayed there overnight. Although the IJ considered Dr. Bastani's opinion that she suffered consistent memory loss as a result of being depressed, he ultimately found this diagnosis did not adequately explain her testimony. Siqeca easily recalled her address and phone number, her children's birthdays and even specifics of traumatic events like the date of her husband's murder, yet she could

not consistently recall the month or year of her rape or related details. Accordingly, Dr. Bastani's affidavit falls short of providing the "extraordinary circumstances" needed for this court to properly reverse the IJ's credibility decision.

Second, the IJ observed that the subpoenas Siqeca submitted did not necessarily corroborate her claim of persecution. The IJ questioned the authenticity of the first summons because it demanded information regarding Siqeca's observations of the election, but was dated November 9, 1998—thirteen days before the election, seven days before Siqeca's report of election irregularities and seven days prior to her appointment as a poll watcher. Where an applicant submits evidence to corroborate her testimony that is inconsistent with other evidence, the applicant must account for the discrepancies. *Capric*, 355 F. 3d at 1086. Here, Siqeca's response was that the prosecutor must have made a typographical error, a speculation the IJ was not obliged to credit.

Siqeca next submits that the IJ violated her due process rights by failing to *voir dire* her expert witnesses. As a result, Siqeca believes, the IJ assigned little or no weight to their testimony, effectively excluding it from the case. In removal proceedings, due process requires that the applicant be afforded "a meaningful opportunity to be heard." *Kuschchak v. Ashcroft* 366 F.3d 597, 602 (7th Cir. 2004). Where "complete chunks of oral testimony" are excluded and where the applicant can show he or she was prejudiced as a result of that exclusion, this court will find a due process violation. *Id.* at 918; *Podio v. INS*, 153 F.3d 506, 507-08, 511 (7th Cir. 1998).

Here, the IJ admitted both affidavits as evidence and considered them both. Accordingly, there was no exclusion and thus no due process violation. At the conclusion of the hearing, the judge assigned no weight to Dr. Fischer's affidavit because it was based in part on Siqeca's application and documentation which the IJ disbelieved. He also assigned little weight to Dr. Bastani's affidavit because he did not believe Siqeca's depression-related memory loss accounted for all of the inconsistent testimony and documentation in her case. Because it is the IJ's role to evaluate the evidence presented, it was within the IJ's discretion to assign little or no weight to the expert affidavits. *Capric*, 355 F.3d at 1086.

Furthermore, contrary to Siqeca's claims, the IJ was not required by *Niam v. Ashcroft*, 354 F.3d 652 (7th Cir. 2004), to conduct a *voir dire* of each expert before assigning weight to their testimony. In *Niam*, the immigration judge ruled that the applicant's expert was unqualified to give an expert opinion and excluded the expert's affidavit without conducting a *voir dire*. 354 F.3d at 659. Here, unlike the situation in *Niam*, the IJ admitted both affidavits as substantive evidence. Furthermore, the IJ did not preclude either expert from testifying at the hearing; the parties chose not to call them.

Siqeca also argues that her due process rights were violated because the IJ became hostile towards her, making "continual suggestions" that Siqeca was lying about her rape and was therefore not an impartial arbiter. In support of her argument, she cites *Reyes-Melendez v. INS*, 342 F.3d 1001 (9th Cir. 2003) without discussion. In that case, the Ninth Circuit found the IJ had acted as a partisan adjudicator where she became aggressive with the applicant, made sarcastic comments, and attacked him for having poor sexual morals. *Id.* at 1007. While due process requires an impartial judge, *see Franklin v. McCaughtry*, 398 F.3d 955, 959 (7th Cir. 2005) an immigration judge is allowed to question an asylum applicant "provided that his conduct does not demonstrate impatience, hostility, or a predisposition against the applicant's claim." *Hasanaj v. Ashcroft*, 385 F.3d 780, 783-84 (7th Cir.2004). The record here indicates no inappropriate questioning on Siqeca's alleged rape:

> JUDGE: . . . [M]a'am, you said you've been raped one time, and I'm trying to be sensitive about this, but that's probably the most horrible thing that's happened to you. Is that right?
>
> SIQECA: Yes.
>
> JUDGE: You've told me that you don't have any mental incapability or anything that keeps you from remembering things generally?
>
> SIQECA: Correct.
>
> . . .
>
> JUDGE: Ma'am, I'm trying to understand how you could forget the worse [*sic*] day that probably, next to the date that your husband died, the date that you were raped. That had to be terrible.
>
> SIQECA: Correct. I remember correctly the rape date, the 18th of June.
>
> JUDGE: Well, you remember it now, but you said a few other things, including you needed [to] see the documents so you can get it right, I guess. Well, I'm paraphrasing. It's my impression you needed to see the documents to confirm it was that date.
>
> SIQECA: That was...the most terrible thing that happened to me, but I did not want to give any dates just like that because it could easily be confused with other dates around it that I had been called in for questioning and all that. . . .
>
> JUDGE: I don't have anything else. . . .

Accordingly, we affirm the decision of the BIA.