POSNER, Circuit Judge,
dissenting.
The immigration judge, the Board of Immigration Appeals, and my colleagues on this panel have confused a failed marriage with a fraudulent one. The majority opinion declares that “the [immigration] judge did not find that the marriage was a sham, but he found that Bouras had failed to meet his burden of proving that he entered into the marriage in good faith.” But if the marriage wasn’t a sham, it must have been in good faith. For what would a bad-faith marriage that was not a sham be? The Board and my colleagues have also ratified a procedural error by the immigration judge that seriously prejudiced the immigrant.
An immigrant otherwise unauthorized to remain in the United States has a path to citizenship by marrying an American citizen, provided that the marriage is not fraudulent—that is, that at the time of the marriage the parties had intended to establish a life together and were not simply marrying for the purpose of obtaining U.S. citizenship for the immigrant. Often in such a case the U.S. citizen spouse is paid. But there is no suggestion of that here; nor is it a remotely plausible possibility given the financial situation of the immigrant spouse.
Often, it is true, the motive for entering a fraudulent marriage is selfless. A famous example, though involving British rather than U.S. citizenship, is W.H. Auden’s 1935 marriage to Erika Mann, the eldest daughter of Thomas Mann. The sole purpose of the marriage was to enable her to leave Nazi Germany and become a British citizen. Both husband and wife were homosexual and never lived together. The marriage was for a good cause but nevertheless was fraudulent. It was never dissolved, because neither party could have entered into a same-sex marriage. Neither party was punished for the fraud. They were lucky to marry in England and not in the United States, if one may judge from the attitude displayed by the authorities in this case.
Bouras, who is Algerian, was working as a taxicab driver in Chicago in 2005 (he had entered the country on a visitor’s visa in 1997, and so had no right to still be here) when, on a visit to a friend in Columbus, Ohio, he met a divorced woman named Jennifer Schreiner. She lived near Columbus and worked as an account manager at CompManagement, Inc., and later as a lost-time claims examiner for Frank Gates Service Company. , Both are Columbus firms that are in the business of administering workers’ compensation insurance contracts. The two married in September 2006. She was 31 years old, he 36.
There is no evidence that the marriage was fraudulent. Jennifer’s job in Columbus paid more than Bouras’s job as a taxicab driver in Chicago, and she owned her home (Bouras at the time shared a rented apartment with another man), and had two young children. Given her job and her family situation, there was no question of her moving to Chicago. So instead Bouras tried to find work in Columbus. He entered a lottery to obtain a license to operate a hotdog stand there, and obtained a license, but it turned out to be in a bad location. He tried to make a go of it but was unable to do so and after several months gave up and returned to his taxicab job in Chicago. While in Columbus he lived with his wife, and after returning to Chicago after the failure of his hotdog venture would return to Columbus every month or so and live with her in her house for two weeks or so.
The majority opinion states that “as evidence that his marriage to Schreiner was *674 in good faith, Bouras submitted an affidavit. from Schreiner, as well as letters and affidavits from several friends and family members, utility bills, photographs of him with Schreiner, copies of unsigned joint income tax returns saying that Bouras had been unemployed and earned nothing during their marriage, an e-mail from Southwest Airlines confirming Schreiner’s purchase of a ticket from Ohio to Chicago in December 2006, Bouras’s Ohio driver’s license and car title, an undated letter showing that Schreiner had opened a joint checking account with Fifth Third Bank, and two bank statements from Fifth Third showing minimal activity in that account.”
Schreiner submitted an affidavit in the administrative proceeding, which the majority opinion summarizes as follows: “Schreiner said that she had lived in Columbus during the marriage while Bouras lived in Chicago. She explained that he did so only because he could not find a job in Ohio, and that every month he took a couple of weeks off from his job driving a cab in Chicago to live with her in Columbus. Schreiner said that she and Bouras had divorced because he wanted children and she did not (she had two young children from a previous marriage). She said that she had changed the electric service for her home into Bouras’s name to make him feel like he ‘belonged] in [their] home’ and that they had a joint checking account with Fifth Third Bank that “was not utilized often.’ Schreiner also said there were not many pictures of the couple because usually one of them was taking the pictures, mostly of her children.” The only fishy element in this account is, as the majority opinion points out, that “Schreiner’s statement in her affidavit that Bouras had worked as a cab driver in Chicago directly contradicts the joint tax returns in which she reported that he was unemployed.” But there isn’t any doubt that Bouras worked as a cab driver in Chicago.
The couple separated in August 2008, apparently because Bouras wanted to have children, while Jennifer, having two children from her previous marriage living with her, did not. They also had quarreled over her dog. The following year they divorced.
I wouldn’t expect a marriage between an Algerian immigrant who drives a cab in Chicago and an American woman (Jennifer’s maiden name is “Jones” and photographs of her, her children, and her sister—who submitted an affidavit on Bouras’s behalf—make plain that they are of northern European, not north African, ethnicity) who has a corporate job in another state to have the brightest prospects for success. And though commuting marriages have become fairly common, such a marriage can place a great strain on a relationship. The combination of a marriage between persons in different socio-economic classes and of different nationalities with the fact that one has children by a previous marriage and the other does not and that it’s a commuting marriage doesn’t augur well for marital stability. Ten percent of second marriages (marriage to Bouras was Jennifer’s second marriage) end within one year. Awo, “Marriage and Divorce,” www.avvo.com/legal-guides/ugc/marriage-divorce-statistics (visited Mar. 1, 2015, as were the other websites cited in my opinion). Bouras’s marriage to Jennifer endured (treating their separation as its termination) for 23 months.
In deciding to deport Bouras the immigration judge and the Board of Immigration Appeals made some downright silly remarks, noting for example that Bouras had failed to explain why Jennifer had not moved with him to Chicago. She had young children, other family, a house that she owned, and a good job in Ohio, and *675 there is no information on what her prospects for obtaining a job in Chicago comparable to her Columbus job would have been. Also the cost of living is lower in Columbus than in Chicago. NUMBEO, “Cost of Living Comparison between Chicago, IL and Columbus, OH,” www. numbeo.com/cost-of-living/compare_cities. jsp?countryl=United + States&cityl= Chicago' + IL&country2=United + States&city2=Columbus' + OH. Another silly remark was that the couple had not “commingled” its assets. Not all married couples do—and it is doubtful that Bouras has ever had any significant assets.
The immigration judge couldn’t understand why, Bouras’s hotdog stand having fallen through, he had not waited the required amount of time and then started driving a cab in Columbus. He had obtained an Ohio driver’s license on February 16, 2007, so the six-month waiting period before he could use it as a taxicab driver would have ended in August of that year. His hotdog stand failed in June and on July 17, 2007, he re-applied for an Illinois driver’s license and was therefore required to and did surrender his Ohio license (one is allowed to have only one state’s driver’s license at a time, so to obtain the Ohio license he had to give up his Illinois one). Once he decided to go back to Chicago to make some money driving a cab in July 2007 he could not return and try to obtain an Ohio commercial driver’s license as well. The fact that he obtained a license to open a hotdog stand in Ohio and operated it, and obtained an Ohio driver’s license as well, is evidence that he intended to live with his wife. So far as appears, he returned to Illinois only because his employment prospects in Ohio turned out to be poor. We have no information on openings or income in cab driving in Columbus in 2007.
The immigration judge was troubled by the fact that during the marriage Bouras made several long trips to Algeria, to visit his family there, and didn’t take Jennifer with him. (He was able to leave and return to the United States because he had become a conditional permanent resident on the basis of his marriage.) But there is no evidence that she could have spared the time either from her job, or from her still-young children, to take such trips. As for where Bouras got the money for the plane tickets, it might have been from his wife, from his Algerian family, or even out of his own pocket, because even today one can buy a round-trip ticket between Chicago and Algiers for less than $800. The price may have been lower when he made the trips during their marriage, which ended some years ago. Anyway how the trips were financed was not considered by the immigration judge or the Board of Immigration Appeals.
There is no evidence that Jennifer had a financial motive in marrying Bouras or that she ever obtained any money from him (her income was higher than his, but she had child and household expenses that he didn’t), and so a financial motive for her agreeing to marry him (and thus smooth his way to eventual U.S. citizenship) can be excluded. There is also no evidence of a selfless motive for a phony marriage, as in the Auden-Mann marriage. Does an apparently successful middle-class Midwesterner marry an illegal Algerian immigrant who drives a taxi in another (and non-adjoining) state because she feels sorry for him for not being a U.S. citizen? Not likely—and there’s no evidence of such an Audenesque motive. I cannot locate the factual basis for supposing the marriage to have been fraudulent.
In all likelihood what did in Bouras was the immigration judge’s refusal to grant a continuance to enable Jennifer to testify at *676 Bouras’s hearing. When the hearing began, his lawyer- told the immigration judge that Jennifer couldn’t appear because of a severe staffing shortage in her office in Columbus that would keep her tied up there for six to eight weeks. It’s not as if Chicago and Columbus were next door, so that she could have taken a few hours off work to attend the hearing. The two cities are 356 miles apart by road, and it takes six hours to drive from one to the other. Flying is faster of course, but given the frequent delays in current American air travel plus the added travel time from origin to airport at one end of the trip and from airport to destination at the other end, overall travel time is unlikely to be significantly shorter by air than by road.
Bouras’s lawyer had received a fax from Jennifer five days before the hearing, informing him that she could not attend it on the scheduled date. He should have notified the immigration judge promptly, but failed to do so. But that delay was not a factor in the immigration judge’s refusal to grant a continuance, concerning which he said only:
I don’t continue cases once they’re scheduled for a final hearing unless there’s an emergency situation. If the respondent’s wife could not come to court because of her work, then she’s not able to come to court. That’s the bottom line. I don’t continue cases after a case is scheduled for trial unless there’s some extenuating circumstance.
This means that even if Bouras had talked to Jennifer five months rather than five days earlier and promptly notified the immigration judge that she would not be able to appear for a hearing on August 7, 2012, the judge still would not have changed the date of the hearing; for he had scheduled the hearing for that date more than six months earlier. It was not the delay in conveying the information that she couldn’t make the hearing that mattered to the judge, but that the hearing had already been scheduled—whenever. He did not refer this arbitrary policy to a rule or statute, and as far as I know there’s no basis for it—it appears just to be his personal rule, his display of arbitrary bureaucratic power (“Oh, it is excellent / To have a giant’s strength; but it is tyrannous / To use it like a giant.”) Not only is his self-made rule irrational, but he managed to compound the irrationality by overlooking the fact that there was an extenuating circumstance—the staffing shortage in Jennifer’s place of work. All he said about that was that if she “could not come to court because of her work, then she’s not able to come to court. That’s the bottom line.” In other words, tough luck—and that same fatalism might well have led him to say, faced with proof that Jennifer had had a serious illness that precluded her attendance at the hearing, that if she “could not come to court because of an illness, then she’s not able to come to court. That’s the bottom fine.”
I am disturbed by a number of things in the majority opinion, including the statement that “Bouras has yet to explain why he blindsided the judge by waiting until the day of the hearing—indeed, until the end of the hearing—to request a continuance when he knew five days before the hearing that his ex-wife would not be available.” Bouras is a taxi driver, not a lawyer. He was represented by a lawyer who specializes in immigration law. It was counsel’s responsibility to notify the immigration judge promptly of Jennifer’s inability to attend the hearing. Unfortunately Bouras’s lawyer, although as I said he specializes in immigration law, did not represent his client competently.
The majority opinion points out that “Schreiner did not say, and has never said, that even with sufficient advance notice *677 she would not have been able to adjust her work schedule to accommodate Bouras’s need for her testimony.” But when was she supposed to have said that? As far as appears, she was never asked whether she could adjust her work schedule to accommodate Bouras’s need for her testimony. Certainly the immigration judge didn’t ask her, or ask Bouras’s lawyer to ask her. She was kept in Ohio because her office was down to two staff members and it would take her six to eight weeks to train a new hire to fill the third slot. There is no basis for supposing that she had foreseen this emergency and could therefore have notified Bouras’s lawyer of her future unavailability before the immigration judge scheduled the hearing. (Remember that she’d had to have foreseen it six months earlier and immediately notified the immigration judge, in order to have a prayer that he’d grant a continuance, given his “rule.”) Though he says that his “rule” does not apply if there is an emergency or some (other) extenuating circumstance, there was an extenuating circumstance; it’s difficult to understand how the immigration judge managed to overlook that.
The length of the delay sought by Bour-as’s lawyer, and the age of the case, may explain the immigration judge’s impatience and inattention, along with the fact that like most immigration judges he doubtless is overworked. But there was a simple, economical alternative to granting a multi-week continuance, and that was to arrange for Jennifer to testify telephonically. She could have done that if need be after work, since Chicago’s time is an hour behind Columbus’s. The immigration judge should have considered that option, as is obvious from the fact that in reviewing his decision the Board of Immigration Appeals chided Bouras for not having thought to arrange for various persons who submitted affidavits concerning the bona fides of the marriage to testify in person or telephoni-cally. We have heard cases in which the immigration judge had obtained evidence from an expert witness telephonically. See, e.g., Niam v. Ashcroft, 354 F.3d 652, 659 (7th Cir.2004). And with Skype or some equivalent video-type linkup, a telephonic interview is almost indistinguishable from an interview in person; it is face to face, albeit mediated electronically.
The majority opinion notes the complaint of the Board of Immigration Appeals that Bouras “had not clarified whether his ex-wife ‘could provide testimony by phone or in-person on a date that would not conflict with her work schedule.’ ” It is possible that neither Bouras nor his lawyer were aware that witnesses can testify in an immigration hearing by telephone, though Bouras’s lawyer had made an appearance in the case by telephone. In any event the immigration judge didn’t mention the telephonic option; the Board mentioned it, but that of course was too late. Chapter 4 of the Immigration Court Practice Manual, www.justice.gov/eoir/vll/ OCIJPracManual/Practice_Manual_review. pdf#page=67, sets forth a (needlessly) complicated procedure for telephonic testimony. One might expect an immigration judge to have reminded Bouras’s lawyer of the procedure, but of course he did not. Or he could just have asked for her phone number and called her. Immigration hearings are informal.
It could be argued that had Bouras wanted Jennifer to testify, his lawyer would have asked the judge to issue a subpoena, and he did not. But when could he have done that? Until five days before the scheduled hearing he and his lawyer expected her to appear voluntarily. When she said she couldn’t appear because of her work, the lawyer sought a continuance. When that was denied, it was too late to subpoena her. Nor is it at all clear that the immigration judge would have issued a *678 subpoena. For remember his fatalistic declaration that “If the respondent’s wife could not come to court because of her work, then she’s not able to come to court.” Case closed.
He may have believed that Bouras’s lawyer had failed to ask that Jennifer be subpoenaed because he feared that she would testify against him. But that is hardly likely, as it would contradict her sworn affidavit and also make her a party to a fraudulent marriage, which might invite criminal prosecution.
Incidentally, the affiants include not only Jennifer but also her sister—the sister’s affidavit is particularly moving, and as it is better written than the briefs of Bouras’s lawyer I am persuaded that it was indeed written by her and reflects her true beliefs. There is no reason to suspect that either she or Jennifer would have any incentive to perjure themselves in order to obtain citizenship for Bouras. What benefit could they possibly derive from testifying in favor of an illegal immigrant with whom they’ve had no relationship for years? Bouras and his wife had separated in August 2008, and the hearing was not until August of 2012. Since we know that Bouras could not have bribed Jennifer to marry him, she was in no danger of giving testimony that would expose her to being prosecuted for being party to a fraudulent marriage with an illegal immigrant.
Jennifer would have been a key witness. Because the case that the marriage was a sham was so flimsy to begin with, her testimony could have put that theory to rest. She had told Bouras’s lawyer that she wanted to testify on her ex-husband’s behalf, and had she had an opportunity to testify and the immigration judge believed her testimony Bouras would be en route to becoming an American citizen.
Her willingness to testify on his behalf further undermines the inference that the marriage was a fraud perpetrated by Bouras in order to obtain U.S. citizenship. Wouldn’t she have known that by now, were it true? Wouldn’t the fact that the government is trying to expel Bouras from the United States for contracting a fraudulent marriage get her thinking? Yet she has remained willing to testify that the marriage was genuine, a proposition supported by her "sister’s affidavit—-and no .one has suggested that the sister had a motive to lie.
I am perplexed by the statement in the majority opinion that “Bouras never established that Schreiner’s testimony would have been significantly favorable to him. The only evidence we have of what she would have said is her affidavit. That affidavit does not undermine the judge’s findings that the couple had no joint assets, that their purported tax returns were suspect, and that Bouras had spent most of the marriage apart from Schreiner either in Chicago or Algeria.” This contradicts the earlier statement in the opinion that “everyone recognizes that married couples may sometimes need to live apart for a host of reasons. Still, an undocumented alien’s brief marriage to a U.S. citizen, during which the couple spent little or no time together and kept their property and finances separate, raises obvious warning, signs for immigration authorities” (citation omitted). I don’t get it. Why would such a marriage be inconsistent with the acknowledgment that “married couples may sometimes need to live apart for a host of reasons”—in this case the husband’s inability to obtain employment, comparable to his Chicago job, in the state in which his wife was tied down by her job and her children? Also, the suggestion in the passage I just quoted that the couple may have spent no time together is manifestly false. Nor did they spend “little” time together. Nor is it unusual for a *679 married couple not to own property jointly—and anyway there is no basis for thinking that Bouras brought any assets to the marriage.
I also don’t understand the statement in the majority opinion that “there was no inherent inconsistency in the immigration judge’s finding that Bouras had failed to meet his burden of proof without making an affirmative finding of a fraudulent marriage. To obtain the discretionary waiver, Bouras had the burden of proving good faith. The government has not taken the further step of trying to prove by clear and convincing evidence that the marriage was in fact fraudulent” (citations omitted). But if the marriage wasn’t in good faith, that can only have meant that it was fraudulent. If it was not fraudulent, it must have been in good faith. (And how odd it is to place the burden of proof on the person accused of fraud, rather than on the accuser. It’s as if I could sue a person for fraud, present no evidence of fraud, yet it would be his burden to persuade judge or jury that he was not guilty of fraud.)
The immigration judge should have explored the possibility of a telephonic substitute for a continuance, but his failure to do so isn’t critical. What is critical is his unexplained failure to recognize the existence of an extenuating circumstance, though it was staring him in the face. Had he noticed it he might have found some basis for deeming it insufficiently extenuating, or decided that he should have been told about it five days earlier, when Bouras’s lawyer learned about it. Impatient and unsympathetic, he might think it apt punishment for the lawyer’s mistake to order the lawyer’s client deported. He failed to give even a minimally reasoned basis for denying the requested continuance, and overlooked the possibility of a telephonic alternative.
The Board of Immigration Appeals did discuss the immigration judge’s denial of the continuance, saying that “there is no explanation as to why [Bouras] waited until the day of his scheduled individual hearing to advise that his ex-wife was not available to testify in person,” or “why his ex-wife was apparently not provided notice of the hearing until a few days before it was scheduled to occur,” or “whether she could provide testimony by phone or in-person on a date that would not conflict with her work schedule,” and further that “the record does not reflect that the Immigration Judge denied the requested continuance solely out of concern for case completion goals----Rather, the Immigration Judge correctly denied the requested continuance for a lack of good cause.” And finally: Bouras “has not explained how his ex-wife’s testimony would have helped him meet his burden of proving that he entered their marriage in good faith.”
The Board’s opinion is a garble. The comment about the potential value or lack thereof of Jennifer’s testimony makes no sense. She was prepared to testify on Bouras’s behalf, and since they’re divorced and he impecunious, she presumably would be a truthful witness and one well positioned to understand at least ex post why he had married her. Her answer to one question that the immigration judge might have been expected to put to her—“would you still be married to him if you two had agreed about having children and getting rid of the dog?”—might have resolved the case one way or the other.
Earlier in this opinion I quoted the passage in which the majority states that “Bouras never established that Schreiner’s testimony would have been significantly favorable to him. The only evidence we have of what she would have said is her affidavit. That affidavit does not undermine the judge’s findings that the couple *680 had no joint assets, that their purported tax returns were suspect, and that Bouras had spent most of the marriage apart from Schreiner either in Chicago or Algeria.” Her testimony might well have undermined those points, but, more important (as those points are not determinative), it would have offset them if her testimony would have persuaded the immigration judge that she and Bouras had expected, and tried, to make a life together.
He didn’t give her a chance to testify, because of his arbitrary no-continuance rule, even though he thought her a critical witness, saying: “the critical factor in all this case, and what I, I, I find troubling, is respondent’s [having] obtained, not only an affidavit from his ex-spouse, but [also from] her sister and her father, stating that the respondent was married to his daughter and that he visited them together and he saw them. He knew that his daughter was married to the respondent. Plus, an affidavit from a friend. But they’re not, they’re not, they’re not here to testify and basically, you know, I have to give the affidavits less weight because anyone could feel sorry for the respondent and write an affidavit. The motive to submit an affidavit on someone’s behalf may be to help him out because he needs the help for immigration purposes. But I really am forced to decide the issue of whether or not the respondent has submitted sufficient evidence that he intended to make a life together with his spouse when they married. And the only real evidence I see is the affidavit.”
So less weight—fine. But he gave the affidavits no weight, despite the weakness of the government’s evidence. The majority opinion states that the denial of a continuance must be upheld “ ‘unless it was made without a rational explanation.’ ” The immigration judge’s denial was made without a rational explanation. He said that his policy is to deny a continuance asked for after he has scheduled a hearing (even if it was scheduled six months earlier), unless there is an emergency or an extenuating circumstances—there certainly was the latter, which he ignored completely. Where was the rationality?
Unlike its approach in Barma v. Holder, 640 F.3d 749, 751 (7th Cir.2011), the Board in this case didn’t suggest that it was substituting its own ground for denying relief for the immigration judge’s ground; rather it was approving his ground. The majority opinion states that “the Board’s reasons are properly considered where, as here, the Board agrees with the judge’s decision and provides its own supplementary reasoning.” But I don’t see any supplementary reasoning except for the comment that I called—justly, I think—senseless (that Bouras “has not explained how his ex-wife’s testimony would have helped him meet his burden of proving that he entered their marriage in good faith”). The immigration judge’s sole ground for denying relief was that Bouras’s hearing having been scheduled, a continuance to allow his ex-wife to testify would not be granted in the absence of an extenuating circumstance. By basing denial of relief on that ground, the immigration judge implied that there was no extenuating circumstance in this case, but he did not say so, and Jennifer’s inability to travel to Chicago for several weeks was an extenuating circumstance that could easily have been accommodated by asking her to testify telephonically. The immigration judge articulated no “good cause,” as the Board erroneously thought he had, for terminating the case without hearing from Jennifer. And the Board produced no rational supplementation to the immigration judge’s defective reasoning.
What is true, and has turned out to be fatal for Bouras—though it should not *681 have been—is that his lawyer was lackluster. He didn’t notify the immigration judge promptly that Jennifer would not appear. He did not suggest a telephonic alternative to her appearing at the hearing in person. He did not try to subpoena her. There are some first-rate immigration lawyers, especially at law schools that have clinical programs in immigration law, but on the whole the bar that defends immigrants in deportation proceedings (the bar to which Bouras’s lawyer in the proceeding in the Immigration Court belongs, see “DiFranco Law—Practice Areas of Focus,” www.difrancolaw.com), is weak—inevitably, because most such immigrants are impecunious and there is no government funding for their lawyers. This will not trouble judges so enamored of the adversary system in its pristine purity that they do not blanch when an imbalance in the skills of the adversaries’ lawyers produces an unjust result. It’s not as if Bouras, deported to Algeria, will be in a position to sue his American lawyer for malpractice.
Judges are not just umpires. Nor are the judicial officers of the Immigration Court and the Board of Immigration Appeals. Judicial activism is deplored but there is such a thing as excessive judicial passivity, which has been present at all levels of adjudication of Bouras’s ease.
Bouras’s marriage to Jennifer Schreiner failed, but so far as the record shows was bona fide. We should be heeding the analysis of failed versus fraudulent marriage in Bark v. INS, 511 F.2d 1200, 1201-02 (9th Cir.1975) (citations omitted):
The concept of establishing a life as marital partners contains no federal dictate about the kind of life that the partners may choose to lead. Any attempt to regulate their life styles, such as prescribing the amount of time they must spend together, or designating the manner in which either partner elects to spend his or her time, in the guise of specifying the requirements of a bona fide marriage would raise serious constitutional questions. Aliens cannot be required to have more conventional or more successful marriages than citizens. Conduct of the parties after marriage is relevant only to the- extent that it bears upon their subjective state of mind at the time they were married. Evidence that the parties separated after their wedding is relevant in ascertaining whether they intended to establish a life together when they exchanged marriage vows. But evidence of separation, standing alone, cannot support a finding that a marriage was not bona fide when it was entered.... Couples separate, temporarily and permanently, for all kinds of reasons that have nothing to do with any preconceived intent not to share their lives, such as calls to military service, educational needs, employment opportunities, illness, poverty, and domestic difficulties.
We should grant the petition and vacate the removal order. To refuse to do so is to ratify a prime example of administrative incompetence not limited to the immigration judge and the Board of Immigration Appeals, for I cannot understand the eagerness of the Department of Homeland Security to challenge the legitimacy of Bouras’s marriage on such flimsy evidence—an immigrant who has been in the United States for almost 20 years, illegally to be sure (together with millions of other immigrants), yet without engaging in other unlawful activity or failing to earn a modest living by honest labor.