*Gallina v. Wilkinson*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2019

ARGUED: APRIL 28, 2020
DECIDED: FEBRUARY 12, 2021

No. 17-4058-ag

FERDINANDO GALLINA
*Petitioner,*

*v.*

ROBERT M. WILKINSON, ACTING UNITED STATES ATTORNEY GENERAL,
*Respondent.*[*]

————

On Petition for Review of a Final Order
of the Board of Immigration Appeals.

————

Before: WALKER, POOLER, and LYNCH, *Circuit Judges.*

————

Ferdinando Gallina petitions for review of a Board of Immigrations Appeals decision denying him relief under the Convention Against Torture.  Gallina argues

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting Attorney General Robert M. Wilkinson is automatically substituted for former Acting Attorney General Jeffrey A. Rosen as Respondent.

that he was tortured in Italy when he was subjected for more than six years to solitary confinement and other restrictive conditions in Italy's 41-bis prison regime, a prison regime designed to hold persons convicted of Mafia crimes, acts of terrorism, and the like. Gallina contends that he would be returned to 41-bis detention if removed to Italy and thus that he would more likely than not be tortured once more. We disagree that the conditions Gallina has alleged he faced or would face rise to the level of torture, as that term is used in the Convention Against Torture and its implementing regulations at 8 C.F.R. § 1208.18. We therefore DENY the petition for review.

Judge Pooler dissents in a separate opinion.

————

JOSHUA L. DRATEL, Joshua L. Dratel, P.C., New York, NY, *for Petitioner*.

JENNIFER R. KHOURI, Trial Attorney (Joseph H. Hunt, Assistant Attorney General, Russell J.E. Verby, Senior Litigation Counsel, *on the brief*), Office of Immigration Litigation, United States Department of Justice, Washington D.C., *for Respondent-Appellee*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

Ferdinando Gallina petitions for review of a Board of Immigrations Appeals (BIA) decision denying him relief under the Convention Against Torture.[1]  Gallina argues that he was tortured in Italy when he was subjected for more than six years to solitary confinement and other restrictive conditions in Italy's 41-bis prison regime, a prison regime designed to hold persons convicted of Mafia crimes, acts of terrorism, and the like.  Gallina contends that he would be returned to 41-bis detention if removed to Italy and thus that he would more likely than not be tortured once more.  We disagree that the conditions Gallina has alleged he faced or would face rise to the level of torture, as that term is used in the Convention Against Torture and its implementing regulations at 8 C.F.R. § 1208.18.  We therefore DENY the petition for review.

**BACKGROUND**

In 2008, Gallina was arrested in Italy on charges of Mafia association and aggravated continuous extortion.  For nearly a decade starting in his early 20s, following his father's Mafia-related arrest, Gallina worked for the heads of the Mafia in Palermo, Italy: Salvatore and Antonio LoPiccolo.[2]  At his hearing before the Immigration Judge (IJ), Gallina testified that he was trusted by the LoPiccolos,[3]

---

[1] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention Against Torture), *adopted* Dec. 10, 1984, S. TREATY DOC. No. 100-20 (1988), 1465 U.N.T.S. 85.

[2] Certified Administrative Record (CAR) at 131–132.

[3] CAR at 135.

that his job was to accompany and "protect" the LoPiccolos, that he was frequently armed, and that he was "pretty much in charge" of his hometown of Carini within greater Palermo,[4] where he had three or four men in his gang.[5]

As he awaited trial, he was placed in 41-bis detention in the Ascoli prison, to the east and somewhat north of Rome, based on the Italian government's determination that he was a "dangerous person" who had "committed various homicides."[6] In 2012, after a trial, Gallina was convicted on both Mafia association and extortion charges. He remained in 41-bis detention until the end of his sentence in late 2014. Altogether, Gallina spent more than six years in 41-bis detention. Subsequent to Gallina's release from prison and travel to the United States despite being under post-prison supervision, Italy informed Interpol that Gallina was wanted on a 2016 arrest warrant for the 2000 murder of Francisco Giambanco, who had been beaten with a wooden bat and stuffed into the trunk of his car, which was then set on fire.[7]

The conditions in 41-bis detention were highly restrictive. Before the Immigration Judge (IJ), Gallina testified that for his first month of detention, he was "totally isolated" from other detainees and not allowed to leave his cell at all.[8] After the first month and for the remainder of his detention, he was kept in solitary confinement for roughly 23 hours each day. He was allowed one hour per day to

---

[4] *Id.* at 133, 166.

[5] *Id.* at 166.

[6] *Id*. at 139.

[7] *Id.* at 273.

[8] *Id*. at 138, 140.

interact with a small group of other detainees. Gallina testified that the composition of this small group changed "many times," which prevented him from forming and maintaining meaningful social bonds with other detainees.[9] After his first six months of 41-bis detention, Gallina was allowed one phone call to or one visit with his family per month. Phone calls were limited to 10 minutes, and visits to one hour. Visits took place separated by what Gallina described as a "thick, five-centimeter-almost" glass panel.[10] On some occasions, Gallina's monthly call or visit was canceled with minimal or no notice, and he was not allowed to reschedule it for that month.[11] Gallina testified that phone calls with his lawyer were limited in "pretty much the same way" but that he was allowed one short, supervised, in-person meeting with his lawyer each week.[12]

Gallina testified that when he was in his cell, he was permitted to read certain materials, but that he was prevented from "studying" as he pleased.[13] He claimed that there was "nothing else for [him] to do" in his cell.[14] He could not even look out a window because, while the small window in his cell "allow[ed] some light" in, it did not permit him to "see anything outside."[15]

---

[9] *Id*. at 144.

[10] *Id*. at 146.

[11] *Id*. at 147.

[12] *Id*. at 148.

[13] *Id*. at 145.

[14] *Id*.

[15] *Id*.

There was testimony from both Gallina and Dr. Charles Robins, a clinical psychologist, that the conditions of Gallina's detention, particularly his prolonged isolation, caused him psychological harm. Gallina testified that before his detention, he was "completely" healthy and that he "didn't have anything affecting" him.[16] He testified that, as a result of worrying about his family, he had considerable difficulty sleeping but that his requests to see a mental health professional were denied. The clinical psychological evaluation, which was from an expert who met with Gallina before the hearing and which Gallina provided to the IJ, stated that Gallina had or exhibited suicidal volition, post-traumatic stress disorder, depression, severe insomnia, and "[s]evere impairments in mood as well as interpersonal and occupational functioning" upon his release from 41-bis detention.[17] Gallina also testified to significant physical ailments that arose during his incarceration.[18] The expert's evaluation, prior to the IJ hearing, discussed several of these symptoms, most of which the evaluation described as "stress-induced": severe weight loss, severe hiatal hernia pains secondary to a stomach ulcer, severe colonitis, severe hemorrhoidal bleeding, and migraine headaches.[19] While incarcerated, Gallina made "a few requests to see a psychologist or a psychiatrist," which were denied.[20] Gallina received healthcare at least once, for a

---

[16] *Id*. at 155.

[17] *Id*. at 734.

[18] *Id.* at 155.

[19] *Id*. at 726.

[20] *Id*. at 153.

"hole in his tooth", although he declared that he had to go "on a hunger strike for nine days" to obtain the care he needed.[21]

Gallina testified that, after his release from 41-bis detention in 2014, his life in Italy was challenging. On top of his psychological and physical ailments, he found the conditions of his release burdensome and was concerned by what he represented to the IJ as Mafia efforts to locate and kill him for not carrying out a murder assignment in the past.[22] In early 2016, Gallina, in violation of the conditions of his release, left Italy to live with relatives in New York and "hide from the Mafia."[23] He unlawfully entered the United States, by way of Germany and Canada.

After the 2016 Italian warrant was issued for Gallina's arrest for his alleged involvement in the 2000 murder of Giambanco, the Department of Homeland Security located and detained Gallina in New York, served him with a notice to appear, and charged him with removability as a noncitizen unlawfully present in the United States. In 2017, Gallina conceded removability as charged but sought deferral of removal under the Convention Against Torture. Gallina argued that the conditions he was subjected to in 41-bis detention rose to the level of torture, that he would be returned to 41-bis detention if he were removed to Italy, and that he would therefore more likely than not be tortured if removed. The government did not dispute that, if removed to Italy, Gallina would be returned to 41-bis detention.

---

[21] *Id.* at 777.

[22] *Id.* at 160–161.

[23] *Id.* at 161.

The IJ relied, inter alia, on testimony from Gallina, Dr. Robins, and International Law Professor Cesare P.R. Romano, a lay witness whose knowledge of the 41-bis program was based on his human rights advocacy and preparation for the hearing.  The IJ determined that the 41-bis prison regime is "designed to 'break the psyche of the inmates' so that they collaborate by turning in other members of the mafia."[24]  She noted that 41-bis is a special detention regime in the Italian prison system that dates back to the 1980s and has the "stated purpose . . . to prevent members of criminal organizations from having continued contact with these organizations while they are imprisoned.  For this reason, prisoners are isolated and only allowed contact with a controlled number of people inside the jail and under very strict conditions with family members."[25]  She concluded that the psychological and physical harm that Gallina suffered was "intentionally inflicted,"[26] as is required for a finding of torture, and also that the harm was sufficiently severe for a finding of torture.  The IJ granted Gallina's application for deferral of removal.

The BIA reversed.  The BIA found "no indication that Italian prison officials intentionally inflicted or threatened to inflict severe physical pain or suffering" on Gallina, found that the treatment Gallina received fell outside the scope of the regulations implementing the Convention Against Torture, and vacated the IJ's order.[27]  This petition followed.

---

[24] *Id*. at 98.

[25] *Id.* at 92–93.

[26] *Id*. at 97.

[27] *Id*. at 5.

**DISCUSSION**

In his petition, Gallina reiterates his argument (1) that 41-bis detention was designed to induce cooperation, and thus his injuries were intentionally inflicted, and (2) that the 41-bis detention conditions, specifically the prolonged solitary confinement, rise to the level of torture under the regulations implementing the Convention Against Torture. We review the BIA's contrary factual findings, which displace those of the IJ, for substantial evidence and its conclusions of law *de novo*.[28] The BIAs findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."[29]

A. <u>Whether Italy intentionally inflicted Gallina's injuries</u>

In relevant part, Article 1 of the Convention Against Torture defines torture as follows:

> [A]ny act by which severe pain or suffering . . . is intentionally inflicted on a person for such purposes as obtaining from him . . . information or a confession. . . . It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.[30]

---

[28] *Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005).

[29] 8 U.S.C. §1252(b)(4)(B); *Mu Xiang Lin v. U.S. Dep't of Justice*, 432 F. 3d 156, 159 (2d Cir. 2005).

[30] Convention Against Torture art. 1.

Our regulations implementing the Convention Against Torture generally mirror this language.[31] They recognize, however, that some sanctions prescribed by the law of a foreign State may be brutal and highly disproportionate to the penological purpose for which they are imposed. Accordingly, our regulations do not exempt from the definition of torture those "sanctions that defeat the object and purpose of the Convention."[32]

In his petition, Gallina argues that, although his placement in 41-bis detention accorded with Italian law, his detention conditions were chosen for the purpose of inducing his cooperation and were far harsher than warranted by any penological purpose. Thus, he contends, the Italian government's infliction of pain and suffering, through the implementation of the 41-bis regime, satisfies torture's intentionality requirement and does not fall into the lawful-sanctions exemption.

In support of this argument, Gallina attested before the IJ that "the captain of the police . . . told [him] that if [he] were to collaborate with them, that [he] would not have to even have any jail served or . . . detention at all."[33] Gallina also declared that other Italian officials "would threaten [him] by saying that if [he] did not collaborate with them that [he] was going to go through hell in 41-bis."[34] Gallina also offered lay testimony from Professor Romano, who first acknowledged that "the stated aim" of 41-bis is to "prevent contact between members of [organized crime] or groups, and hinder the continuation of criminal

---

[31] 8 C.F.R. § 1208.18(a)(3).

[32] *Id*.

[33] CAR at 142–43.

[34] *Id*. at 777.

activities."[35]    Romano then declared, after reviewing documents on 41-bis detention (ranging from a report prepared by the Council of Europe's Committee on the Prevention of Torture and Inhuman or Degrading Treatment or Punishment to a blog post about 41-bis detention),[36] that "there are reasons to believe that the underlying goal of the [41-bis detention conditions] is . . . to increase the pressure on the prisoners concerned in order to induce them to co-operate with the justice system."[37]    Professor Romano assessed that the "rationale" for the "[m]any restrictions Article 41 *bis* inmates face . . . seems to be purely oppressive" and speculated that such restrictions were "meant to break the psyche of the inmates, to humiliate them, to dehumanize them and delete their identity and personality."[38]  Professor Romano reached these conclusions despite never having visited detainees in a 41-bis prison, never having interviewed former detainees about 41-bis detention conditions, and never having published literature specific to 41-bis detention.[39]

Gallina's evidence does not compel us to conclude that the BIA's finding—that there was "no indication that Italian prison officials intentionally inflicted or threatened to inflict severe physical pain or suffering"[40]—was unsupported by substantial evidence.  Indeed, we find that ample evidence in the record supports the BIA's finding.    According to a report produced by the Extraordinary

---

[35] *Id.* at 380.

[36] *Id*. at 377–78.

[37] *Id*. at 394.

[38] *Id*.

[39] *Id*. at 197–98.

[40] *Id*. at 5.

Commission for the Protection and Promotion of Human Rights of the Italian Senate (Senate Commission Report), the 41-bis prison regime was established to prevent members of dangerous criminal organizations from orchestrating further criminal activity while in prison.[41]  It was enacted in its current form in response to (1) a spate of Mafia killings in 1992 that included the murder of two judges, and (2) the then-prevailing problems in Italian prisons with a large Mafia population, that contained organized prison cells that matched the external cells and that recruited non-Mafia detainees.[42]  The conditions that Gallina faced in 41-bis detention appear consistent with the Italian government's stated purpose for the 41-bis prison regime.  The isolation of 41-bis detainees from each other, the general prison population, and outside visitors (including restricted family contacts) naturally would inhibit the ability of detainees to criminally conspire or access contraband, despite their ties to organized crime.  Regularly changing the composition of the small groups with which detainees were permitted to meet, and thus preventing the development of meaningful bonds among detainees, would also have this effect.  Finally, in *Gambino v. Holder*, another Convention Against Torture case regarding 41-bis detention, the petitioner's own witness conceded to the IJ that "[t]he purpose of the 41 *bis* regime is not to inflict torture, but to house exceptionally dangerous criminals and prevent them from continuing to direct criminal activities from prison."[43]

Gallina's evidence would be a thin reed on which to rest a contrary finding.  Italian officials may have told Gallina that he could avoid "any jail served or . . .

---

[41] *Id*. at 410.

[42] *Id*.

[43] 312 F. App'x 847, 849 (9th Cir. 2009).

detention at all" by cooperating.[44]  But this kind of offer by law enforcement personnel is not surprising.  Offering reduced punishment for cooperation is a routine police and prosecutorial practice that is employed around the world, including in the United States.  Gallina's testimony does not convince us that the real purpose of 41-bis detention was to extract information from detainees by inflicting severe pain and suffering on them.

Nor does Professor Romano's testimony call into question the BIA's finding. As a preliminary matter, Professor Romano testified as a lay witness.  Under the Federal Rules of Evidence, lay testimony is credited only when it is "rationally based on the witness's perception."[45]  Professor Romano's testimony, however, was not based on his actual perception of 41-bis facilities, which did not occur, or conversations with 41-bis detainees, of which there were none.  Rather, it was based on his analysis of various documents describing 41-bis detention.  Although "the strict rules of evidence" that govern federal trials "do not apply in deportation proceedings," the Federal Rules of Evidence do provide helpful guidance in assessing the reliability and trustworthiness of evidence presented before an IJ.[46] As the Seventh Circuit held in *Niam v. Ashcroft*, the "spirit" of the Federal Rules governing witness testimony "does apply to administrative proceedings."[47]  We find that Professor Romano's lack of direct exposure to the 41-bis prison regime dampens the persuasive power of his testimony.

---

[44] CAR at 142–43.

[45] Fed. R. Evid. 701(a).

[46] *Felzcerek v. INS*, 75 F.3d 112, 116 (2d Cir. 1996).

[47] 354 F.3d 652, 660 (7th Cir. 2004).

With respect to the testimony itself, Professor Romano was equivocal on whether, in his estimation, 41-bis detention conditions rose to the level of torture. In his declaration, Professor Romano wrote that "there are reasons to believe" that 41-bis detention is used "as a tool to increase pressure on the prisoners concerned in order to induce them to co-operate."[48]   He described that the restrictions imposed "seem[] to be purely oppressive."[49]  Instead of stating outright that 41-bis detention conditions run afoul of the prohibition on torture, Professor Romano stated that he believed that the 41-bis prison regime "raise[s] issues under Article 27, paragraph 3, of the Italian Constitution and various international human rights instruments."[50]   However, these documents prohibit not only torture but also cruel, inhuman, and degrading (CID) treatment, a lesser form of abuse that, unlike torture, can be perpetrated without an intent to cause severe pain and suffering.[51] It bears mention that the reports on which Professor Romano relied most heavily in developing his testimony, the Senate Commission Report and a report by the European Committee on the Prevention of Torture and Inhuman or Degrading Treatment or Punishment,[52] similarly shied away from identifying a violation of the prohibition on torture.  Professor Romano's testimony therefore provides no basis for us to overturn the BIA's well-supported finding that Gallina's pain and

---

[48] CAR at 394.

[49] *Id.*

[50] *Id.*

[51] *See* Art. 27(3) Costituzione [Cost.] (It.) ("Punishments may not be inhuman and shall aim at re-educating the convicted."); Convention Against Torture art. 16 ("Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture . . . .").

[52] CAR at 378.

suffering were inherent in or incident to a lawful sanction and thus not intentionally inflicted.

B.  <u>Whether 41-bis detention conditions fall within the definition of torture at 8 C.F.R. § 1208.18</u>

In addition to being intentionally inflicted, torture under the Convention Against Torture must cause "severe pain or suffering, whether physical or mental."[53] Our regulations interpreting this language provide that severe "mental pain or suffering must be prolonged mental harm."[54] They then specify the acts that are, within the administrative agency's judgment, capable of giving rise to severe mental pain or suffering:

> (i)   The intentional infliction or threatened infliction of severe physical pain or suffering;
>
> (ii)  The administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>
> (iii) The threat of imminent death; or
>
> (iv)  The threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering

---

[53] Convention Against Torture art. 1.

[54] 8 C.F.R. § 1208.18(a)(4).

substances or other procedures calculated to disrupt profoundly the sense or personality.[55]

As relevant here, Gallina argues that the conditions he faced in 41-bis detention, most notably his prolonged solitary confinement, were "procedures calculated to disrupt profoundly the senses or the personality" within the meaning of § 1208.18(a)(4)(ii). Although we recognize that Gallina developed various persisting mental ailments while in 41-bis detention, we cannot agree that he faced severe mental pain and suffering of the kind envisioned in § 1208.18(a)(4)(ii).[56]

First, it is too great a stretch to characterize 41-bis detention (or its use of prolonged solitary confinement, in particular) as a "procedure," as that term is commonly understood. The pertinent dictionary definition of "procedure" is "a

---

[55] *Id.*

[56] At oral argument, we requested that the parties submit supplemental briefing on whether the treatment Gallina faced in 41-bis detention would, if imposed in the United States, run afoul of the Constitution. A U.S. reservation to the Convention Against Torture provides that its Article 16 obligation to prevent CID treatment (a separate obligation from the Convention Against Torture's prohibition on torture) applies "only insofar" as the alleged CID treatment can reasonably be considered "cruel, unusual and inhumane treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments." U.S. Reservations, Declarations, and Understandings § I(1), Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Cong. Rec. S17486-01 (daily ed., Oct. 27, 1990). In other words, if the treatment imposed on Gallina were permissible in the United States, it would not rise even to the level of CID treatment and therefore could not possibly be torture—an aggravated and intentional form of CID treatment. Having reviewed the supplemental briefing of the parties, we do not rule out that conditions of 41-bis detention might, in certain circumstances, amount to CID, similar to cruel and unusual punishment in violation of our Eighth Amendment. In any event, no such claim is presented here.

series of steps followed in a regular definite order."[57]   Under this definition, the dictionary offers up "a surgical procedure" to illustrate how the term "procedure" might be used.[58]  Detention conditions, which do not proceed in stepwise fashion and do not have an end point at which they are accomplished or completed, do not accord with either the dictionary definition or the common understanding of "procedure."  It is far more likely that the "other procedures" that the agency had in mind are discrete interventions, like sleep deprivation or sensory overload through the use of bright lights, strobe lights, or recurrent loud noises.  Such a reading of "other procedures" is consistent with § 1208.18(a)(4)(ii)'s implied characterization of the "administration or application . . . of mind altering substances" as a "procedure."  We are mindful of the interpretive canon *noscitur a sociis* which, in plain terms, posits that a word is best understood "by the company it keeps."[59]

Second, it is unlikely that the agency would have intended that "other procedures" encompass an entire system of incarceration sanctioned by foreign law—particularly when similar detention conditions, if in somewhat more limited circumstances, are permissible under our domestic law.  We can infer that the agency did "not alter the fundamental details of [its] regulatory scheme,"[60] creating an unbounded array of proscribed conduct, with such a vague and ancillary term as "other procedures."  As the Supreme Court has repeatedly

---

[57] *Procedure*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/procedure (last visited July 22, 2020).

[58] *Id.*

[59] *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).

[60] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

cautioned, our interpretive exercise strongly disfavors finding elephants in mouseholes.[61]

Third and finally, a limited reading of "other procedures" is consistent with the way prolonged solitary confinement is treated under international law. To date, no international tribunal or treaty body has found that prolonged solitary confinement, without more, rises to the level of torture as distinguished from CID treatment. In *Case of Ilaşcu and Others v. Moldova and Russia*, the European Court of Human Rights found that being "held in solitary confinement . . . having no contact with other prisoners or access to newspapers" for a period of years "can be qualified as inhuman and degrading treatment."[62] By contrast, the European Court assessed that being held in solitary confinement, in combination with periodic beatings, denials of food, or placement on death row, "must be considered [an] act[] of torture."[63] Consistent with *Ilaşcu*, the Committee Against Torture, the treaty body responsible for the Convention Against Torture, has specified that "solitary confinement *might* constitute torture or inhuman treatment," implying that only the most severe instances of solitary confinement, aggravated by deliberate abuse, would run afoul of the prohibition on torture rather than the separate prohibition on CID treatment.[64] Unable to find international cases that describe the conditions he faced as torture, Gallina blurs the distinction between torture and CID treatment. He cites, for instance, cases

---

[61] *Id*.

[62] 2004-VII Eur. Ct. H.R. 179.

[63] *Id*.

[64] Comm. Against Torture, *Observations of the Committee Against Torture on the Revision of the United Nations Standard Minimum Rules for the Treatment of Prisoner*, U.N. Doc. CAT/C/51/4 (Dec. 16, 2013) (emphasis added).

from the Inter-American Court of Human Rights that hold that "prolonged isolation and coercive solitary confinement are, in themselves, cruel and inhuman treatments."[65]  But again, as the Convention Against Torture provides[66] and our regulations make crystal clear,[67] CID treatment and torture are not coextensive.  To the extent that international law characterizes prolonged solitary confinement, without more,[68] as CID treatment rather than torture, this treatment does not implicate the United States's obligation under Article 3 of the Convention Against Torture to refrain from removing persons to countries in which they are likely to be tortured.[69]  Section 1208.18, of course, implements this specific Article 3 obligation.[70]

---

[65] Petitioner's Br. at 33.

[66] *See* Convention Against Torture art. 16 (creating a separate prohibition on CID treatment that does not rise to the level of torture).

[67] *See* 8 C.F.R. § 1208.18(a)(2) ("Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture.").

[68] We acknowledge that Gallina was, in addition to being placed in solitary confinement, denied access to a psychologist or psychiatrist when he wanted "some medication to help [him] sleep."  CAR at 154.  This is not remotely analogous to the kind of abuse that transformed the prolonged solitary confinement in *Ilaşcu* into torture.  We therefore find it insufficient to transform Gallina's prolonged solitary confinement into torture.

[69] *See* Convention Against Torture art. 3 (establishing a no-return obligation when an individual "would be in danger of being subjected to torture," specifically).

[70] Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681-822 (1998).

We therefore find that the 41-bis detention conditions that Gallina has described do not rise to the level of torture. Thus, Gallina's petition for deferral of removal under the Convention Against Torture must be denied.

The BIA determined that Gallina's 41-bis incarceration was a lawful sanction under Italian law and that its effects on Gallina were both not intended by the Italian authorities and incidental to his incarceration.[71] The BIA also found that the psychological harm of which Gallina complained (PTSD and insomnia) did not qualify as "pain or suffering" within the meaning of the operative regulation, 8 C.F.R. §1208.18(a)(4).[72] Therefore, even if he was denied psychiatric treatment, Gallina "did not establish[] that he experienced 'mental pain or suffering' rising to the level of 'torture'" under that provision.[73]

It bears reiterating that the IJ's findings to the contrary, upon which our dissenting colleague relies, were rejected by the BIA. When this occurs, it is the findings of the BIA, and not the IJ, that we are reviewing, and the standard of review is a deferential one.[74]

The BIA's findings must be upheld if there is "substantial evidence" to support them, and they are "conclusive unless any reasonable adjudicator would

---

[71] CAR at 4.

[72] *Id.* at 4–5.

[73] *Id.* at 5.

[74] *Chen*, 417 F.3d at 271.

be compelled to conclude to the contrary."[75]  We agree in substance with the BIA's findings and therefore easily conclude that "substantial evidence" supports them.

Our deference to the BIA's factual findings in conjunction with our legal analysis above leads to our ultimate conclusions.  The dissent does not meaningfully explain how it overcomes the deference owed to the BIA when it disagrees with the BIA's factual findings.

We fully appreciate our dissenting colleague's discomfort with this case. The conditions of prolonged 41-bis incarceration are indeed severe and, as we have noted, can in aggravated circumstances amount to cruel, inhuman and degrading treatment that is similar to "cruel and unusual punishment" under the Eighth Amendment.  But such incarceration conditions do not, either generally or as implemented in this case, meet the more heightened requirements of "torture" within the meaning of the Convention Against Torture and its domestic counterpart 8 C.F.R. §1208.18(a).

## CONCLUSION

For the reasons stated above, we DENY the petition.

---

[75] 8 U.S.C. §1252(b)(4)(B); *Mu Xiang Lin*, 432 F. 3d at 159.

POOLER, *Circuit Judge*, dissenting:

Prolonged solitary confinement is one of the true horrors of the modern-day penal system. "Years on end of near-total isolation exact a terrible price." *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, *J.*, concurring). Studies have shown that prolonged solitary confinement can result in paranoia, hallucinations, suicidal ideation, feelings of impending doom, decline in mental functioning, insomnia, nightmares, and many other symptoms related to severe depression and anxiety. *See Porter v. Clarke*, 923 F.3d 348, 355-57 (4th Cir. 2019). Other effects include post-traumatic stress disorder ("PTSD"), self-mutilation, obsessional thinking, dangerous weight loss, and aggravation of preexisting health issues. *Williams v. Sec'y Pa Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017). "[T]here is not a single study of solitary confinement wherein nonvoluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects." *Id.* at 566 (internal quotation marks, brackets, and citations omitted). That these scars may not be visible makes them no less agonizing.

The Italian 41-bis prison regime, which uses prolonged solitary confinement, is intensely restrictive, due largely to additional measures implemented in 2009. Prisoners are locked alone in their cells for 22 hours each

day. They can read, watch television, or listen to the radio, but nothing else, and they are subjected to surveillance while in their cells. They are allowed to socialize for one hour with four other inmates, and the only acceptable activities during this time are playing cards or board games or using an indoor exercise bicycle. Contact, including greetings, with other prisoners are strictly prohibited, even if those inmates had formerly been a member of one's socialization group. Prisoners are allowed one hour of outdoor exercise as well. Prisoners get one 10-minute phone call per month or one one-hour visit per month, under closed conditions and with audio and video recording. The European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment described the regime as "very impoverished." CAR at 572. The combination of this impoverished regime and the "severe restrictions on contacts . . . may, if applied for prolonged periods, have harmful effects of a psychological and physical nature." CAR at 572.

Fernando Gallina spent his first month in a 41-bis prison in complete isolation. He was not allowed to leave his cell or telephone his family during the entire month. His next nearly seven years did not allow for significantly more contact. He was confined for twenty-three hours each day. He was allowed one

hour each day with a small group of other inmates, who were rotated out frequently to prevent them from forging social bonds. He was frequently denied his one allotted family visit or ten-minute phone call each month. He was denied mental health care.

Unsurprisingly, Gallina developed a number of physical and psychological ailments typical of prolonged solitary confinement. An expert psychologist whose practice focuses on trauma victims, Dr. Charles Edward Robins, testified that Gallina suffers from "severe depression, for which he has been prescribed Zoloft and anti-depressants;" "vivid flashback nightmares of the screams of prisoners at [the prison] and the sounds of prison doors slamming shut;" "severe claustrophobia;" and extreme anxiety. CAR at 90 (internal quotation marks and brackets omitted). Dr. Robins also diagnosed "severe PTSD," as well as "severe insomnia, spontaneous weeping and traumatic nightmares; and suicidal volition." CAR at 91 (internal quotation marks omitted). Gallina "lost over 50 pounds; developed severe colonitis; severe hemorrhoidal bleeding; and a hiatal hernia secondary to a stomach ulcer from stress-induced hyperacidity." CAR at 90 (internal quotation marks omitted). Gallina "also developed migraine

3

headaches." CAR at 90. Dr. Robins opined that if Gallina is returned to the 41-bis environment, he would commit suicide.

Why impose such a heavy toll? Not for any legitimate penological objective. Rather, it was Gallina's refusal to collaborate with and provide names to the Italian authorities that drew such harsh punishment. Prolonged solitary confinement is nothing short of torture in most cases, and this is one of them.

As set forth in the majority opinion, the domestic regulation implementing CAT guides our analysis. *See* 8 C.F.R. § 1208.18. In relevant part, that regulation exempts from the definition of "torture" any "pain or suffering arising only from, inherent in or incidental to lawful sanctions." *Id.* § 1208.18(a)(3). The regulation further provides that "[i]n order to constitute torture, mental pain or suffering must be prolonged mental harm caused by or resulting from," in relevant part, "[t]he administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality." *Id.* § 1208.18(a)(4)(ii).

Gallina's appeal raises two questions: first, whether his prolonged solitary confinement falls under the lawful-sanctions exemption, and second, whether this solitary confinement constitutes "other procedures calculated to disrupt

4

profoundly the senses or the personality." 8 C.F.R. § 1208.18(a)(4)(ii). The majority answers yes to the first and no to the second. These questions are difficult. The majority's conclusions are not unreasonable, but they are incorrect. In reaching this conclusion, I am mindful that we defer to *factual* findings of the BIA when they are supported by substantial evidence. *See Hong Fei Gao v. Sessions*, 891 F.3d 67, 76 (2d Cir. 2018). Questions of law and the application of law to fact, however, are reviewed de novo. *Id.* The BIA's conclusion that Gallina's experiences in 41-bis, even if true, did not meet our regulatory definition of torture is an application of facts to law and therefore not entitled to the deferential "substantial evidence" standard. After engaging in a plain reading of the regulation and related law and applying it to the record, I conclude that I must respectfully dissent from the denial of CAT relief in this case.

## I. The Lawful-Sanctions Exemption Does Not Apply.

Conditions of confinement that stem from judicially imposed sanctions following a lawful conviction are not ipso facto exempted from the definition of torture. "Barbaric prison conditions might constitute torture if they cause severe pain or suffering and if circumstances indicate that the intent of the authorities in

causing the severity of pain and suffering (over and above the discomforts incident to confinement in that time and place) is to illicitly discriminate, punish, coerce confession, intimidate, or the like—just as live burial would be torture even if somewhere it were the lawful sanction for an offense." *Pierre v. Gonzales*, 502 F.3d 109, 121 (2d Cir. 2007).

The majority acknowledges this principle of proportionality but goes on to state that "[t]he conditions that Gallina faced in 41-bis detention appear consistent with the Italian government's stated purpose for the 41-bis prison regime," i.e., to prohibit communications leading to additional organized crime, which the majority concludes indicates a lack of intent to inflict severe pain or suffering on Gallina. The majority further concludes that Gallina failed to adduce sufficient evidence to show that his conditions were imposed for the purpose of inducing his cooperation and that the conditions are far harsher than warranted by any penological purpose.

As an initial point, I disagree with the BIA and the majority's reliance on the apparent consistency between the stated purpose of 41-bis and the conditions of Gallina's detention. Any number of torturous conditions may be consistent with legitimate purposes. Taking the example provided in *Pierre*, live burial

would adequately address any security concerns and promote deterrence objectives—but that surely does not mean that live burial is exempt from the definition of torture. The BIA, however, accepted that any consistent legitimate justification is sufficient to invoke the lawful-sanctions exemption. That is erroneous. The BIA should not have relied solely on the existence of one ostensible, legitimate purpose to find a lack of intent when the challenged treatment may be consistent with other, illegitimate purposes as well.

Nor can I agree with the majority that Gallina failed to amass sufficient evidence to demonstrate that the real purpose of his detention conditions was to coerce collaboration with the authorities. The reports in the record, Professor Cesare Romano's testimony, and Gallina's uncontroverted testimony all indicate that though the 41-bis regime originated to prevent members of dangerous criminal organizations from engaging in further organized crime while imprisoned, it has since evolved into something primarily punitive and coercive.

**A. The CPT Report**

The regime has been amended over time, with the latest amendment occurring in 2009. Professor Romano's written report explains that "instead of being progressively relaxed, as circumstances improved, the Article 41 *bis* regime

7

has become increasingly harsh." CAR at 381. The additional restrictions include a reduction in the number of prisoners allowed per each socialization group from five individuals to four individuals; a reduction in the time prisoners are allowed to spend outside their cells from four hours to two hours; and further curtailment of contact with the outside world, such as family members or lawyers.

Indeed, a report prepared by the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment ("CPT Report") explains that "the CPT must stress that the argument frequently put forward by the Italian authorities—that the additional restrictions which have been introduced in 2009 were necessary in order to combat more effectively the phenomenon of organised crime and thus to enhance the protection of society— is scarcely convincing." CAR at 573. The report's authors were confident "that the prison administration is able to maintain the same level of security irrespective of whether the '41-bis' prisoners of a given living unit are able to associate for two, four or more hours per day." CAR at 573. "Against this background," the CPT Report states, "there are reasons to believe that the underlying goal of the most recent legislative changes is rather to use additional restrictions as a tool to increase the pressure on the prisoners concerned in order

8

to induce them to co-operate with the justice system," which would be not only "highly questionable" but also "raise issues under . . . various international human rights instruments to which Italy is a Party." CAR at 573.[1]

These observations in the CPT Report make plain that crime-prevention concerns were no longer considered to be the regime's motivating factor. Likewise, the blunt characterization of the crime-prevention rationale as "scarcely convincing" speaks volumes. Therefore, even absent a direct legal conclusion on the issue, the CPT Report provides a substantial basis for doubting the stated purpose of Gallina's conditions.

---

[1] Given the information in the CPT Report, I am not persuaded by the majority's reliance on the Ninth Circuit case *Gambino v. Holder*, 312 F. App'x 847 (9th Cir. 2009). It is true that both *Gambino* and the present case involve the 41-bis system. But the similarities end there. Importantly, the harsher aspects of the regime discussed in the CPT Report were added in 2009—clearly before Gallina, but not Gambino, was incarcerated. What the witness in *Gambino* said then did not consider the more brutal restrictions that served as the basis for the CPT's skepticism towards the crime-prevention rationale. In addition, *Gambino* is an unpublished decision with sparsely recorded facts, making it difficult to assess what Gambino's detentions were like, to the extent they deviated from typical 41-bis practices, or what evidence was before the court. By contrast, as discussed more fully below, here Gallina has alleged deliberate denial of mental health care, a fact that elevates the severity of his detention and significantly strengthens the notion that his conditions were intentionally coercive. For these reasons, *Gambino* is not analogous.

## B. Professor Romano's Testimony and Report

Similarly, I disagree with the majority that Professor Romano's testimony "provides no basis for us to overturn the BIA's well-supported finding."[2] Maj. Op. at 14. Professor Romano testified that "there are aspects of the 41-bis regime that seem to suggest that the purpose is not only, or solely to prevent contact and continuing criminal activities for these people, but that is actually meant to break them psychologically so that they will turn in other members of the organizations or they will snitch." CAR at 225. This conclusion is echoed in Professor Romano's written report, which states that "the purpose of many of the restrictions seem to be purely punitive and to force inmates to confess or implicate others; all goals that are prohibited under the internationally accepted definition of torture. Overall, the physical and mental pain or suffering that is imposed does not seem to be 'arising only from, inherent in or incidental to the lawful sanction.'" CAR at 393 (footnotes omitted).

---

[2] To be clear, the BIA did not explicitly find that the *only* purpose of 41-bis is to prevent further criminal activity. It merely said that the stated purpose was legitimate and thus 41-bis's conditions were a lawful sanction. Thus, Gallina does not have to overcome the deferential standard of review cited by the majority to prove the existence of an ulterior purpose.

Although the reliability of Professor Romano's testimony and report are undisputed, the majority first finds that Professor Romano's testimony has diminished persuasive value because he had never been to a 41-bis prison. According to the majority, although the Federal Rules of Evidence do not apply to administrative proceedings, Professor Romano's "lack of direct exposure . . . dampens the persuasive power of his testimony" and violates the "spirit" of the Federal Rules. Maj. Op. at 13. But the IJ found Professor Romano credible, a finding undisturbed by the BIA. "It cannot be overstated that our review of the IJ's credibility findings is highly deferential," and our Court must defer to these determinations "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Majidi v. Gonzales*, 430 F.3d 77, 79 (2d Cir. 2006) (internal quotation marks omitted) (quoting 8 U.S.C. § 1252(b)(4)(B)). But the majority does not conclude that any reasonable adjudicator would be compelled to discount Professor Romano's testimony. Discounting Professor Romano's testimony based on the "spirit" of the Rules thus amounts to an improper rejection of the IJ's credibility finding.

The majority next focuses on Professor Romano's use of the words "seem" and "there are reasons to believe" as reasons to discount his testimony. But the

11

majority overlooks that Professor Romano's testimony and report are replete with unambiguous statements as well. For instance, in his written report, Professor Romano stated without qualification that the 41-bis restrictions "*are meant to* break the psyche of the inmates, to humiliate them, to dehumanize them and delete their identity and personality." CAR at 394 (emphasis added). He went on to state, "[t]here *is no actual connection* between some aspects of the regime and the stated purpose to eradicate any relationship with the criminal organization." CAR at 394 (emphasis added). And in his testimony, he explicitly stated that "*there are* aspects [of 41-bis] that are falling short of international human rights standards." CAR at 233 (emphasis added). Professor Romano also testified that "the Committee on the Prevention Against Torture is concerned that the regime *is increasingly becoming harsher* and harsher on detainees, *for no apparent valid justification*." CAR at 226 (emphasis added). Though Professor Romano used equivocal terms at times, a fuller reading of his report and testimony makes clear that Professor Romano did not consider the stated purpose to be the real purpose of 41-bis's conditions.

### C. Gallina's Testimony

Gallina's testimony provides further support for the conclusion that his conditions of confinement were imposed for a coercive objective. For instance, Gallina, whose credibility is uncontroverted, testified that a police captain told him that the reason he was subjected to complete solitary confinement for the first month of his detention was because he needed to collaborate and turn in names. That Gallina was placed in prolonged solitary confinement even before his conviction also shows that his confinement was used as a coercive tool. Juan Méndez (Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment), *Interim Rep.*, ¶ 73, U.N. Doc. A/66/268 (Aug. 5, 2011) (noting that "the practice of solitary confinement during pretrial detention creates a de facto situation of psychological pressure which can influence detainees to make confessions or statements against others"). And while it is true, as the majority states, that the police captain told Gallina at the time of his arrest that he would not be subject to detention at all if he collaborated, Gallina also testified that his requests to be removed from 41-bis were denied because he did not collaborate.[3] It is one thing to tell a charged defendant or arrestee that he

---

[3] Professor Romano's report explains that "detention [under 41-bis] is four years long, and afterwards it is renewable every two years, if the inmate is believed to

13

can avoid detention through cooperation at the beginning of the proceedings, and quite another to tell a convicted defendant that he is to be continually subjected to prolonged solitary confinement for his failure to cooperate.

Even assuming for the sake of argument, however, that the crime-prevention rationale justified prolonged solitary confinement, I would still conclude that the conditions of Gallina's confinement were imposed for the purpose of inducing cooperation and far harsher than warranted by any penological purpose. Gallina was told, in writing, that his requests for psychiatric care due to difficulty sleeping were denied because he had not yet collaborated with the authorities—a telling fact that the majority virtually ignores. I fail to see how denial of psychiatric care is properly justified by a crime-prevention rationale, especially in light of other evidence that psychiatric drugs to help with sleep were frequently and liberally given to other 41-bis inmates. On this record, the only plausible explanation for the deprivation Gallina suffered is the one he was given: that he had not "conced[ed]," not "collaborat[ed]," and was "still a Mafioso." CAR at 153 (internal quotation marks

---

be still in contact with his organization. However, renewals are automatic, with judges merely rubberstamping the decision." CAR at 381.

14

omitted). Taken alone, this fact makes manifest that Gallina's conditions of confinement were motivated by a coercive, illegitimate purpose.

Finally, in the Eighth Amendment context, a legitimate penological objective cannot support the imposition of prolonged solitary confinement on defendants with mental health ailments. *See, e.g.*, *Palakovic v. Wetzel*, 854 F.3d 209, 226 (3d Cir. 2017). One court has gone so far as to state that "if particular conditions of segregation being challenged are such that they inflict a serious mental illness, greatly exacerbate mental illness, or deprive inmates of their sanity, then defendants have deprived inmates of basic necessity of human existence—indeed, they have crossed into the realm of psychological torture." *Madrid v. Gomez*, 889 F. Supp. 1146, 1264 (N.D. Cal. 1995). While this precedent is not controlling, it certainly suggests that subjecting Gallina to prolonged solitary confinement in light of his current mental illness falls outside the lawful-sanctions exception, regardless of a legitimate penological objective.

For these reasons, I cannot agree with the majority that, given the stated crime-prevention purpose of 41-bis, Gallina's detention conditions were unintentional and merely inherent in, or incidental to, lawful sanctions. The purpose of Gallina's conditions was undoubtedly coercive.

15

**II.** **"Other Procedures Calculated to Disrupt Profoundly the Senses or the Personality"**

What constitutes "other procedures calculated to disrupt profoundly the senses or the personality" as set forth in the CAT regulation, 8 C.F.R. § 1208.18(a)(4)(ii), is an issue of first impression. The majority interprets this phrase narrowly, such that prolonged solitary-confinement conditions like those Gallina suffered are not covered by that phrase. But given the breadth of the regulation's own text, I disagree.

**A. The Plain Text Understanding**

As legal scholars have recognized, an appropriate reading of "other procedures calculated to disrupt profoundly the senses or the personality" is a broad one. "Why shouldn't other procedures calculated to disrupt profoundly the sense or the personality include, for example, the careful contrivance of prolonged isolation and sleep deprivation frequently employed in Guantanamo?" David Luban & Henry Shue, *Mental Torture: A Critique of Erasures in U.S. Law*, 100 Geo. L.J. 823, 848 (2012). The category "would surely include nonpharmaceutical interventions such as electrical stimulation of the brain, surgical procedures like lobotomies, and prolonged sensory deprivation." *Id.*

"Any number of practices—isolation, sensory deprivation, or interrogation practices relying on phobias, religious taboos, or cultural identity—could meet [the Section 1208.18(a)(4)(ii)] criteria." Kate Riggs, Richard Blakely & Jasmin Marwaha, Note, *Prolonged Mental Harm: The Torturous Reasoning Behind a New Standard for Psychological Abuse*, 20 Harv. Hum. Rts. J. 263, 268 n.26 (2007).

The view of these scholars is in line with a plain understanding of the CAT regulation's text.[4] The dictionary defines procedure as "a particular way of accomplishing something or of acting." *Procedure*, Merriam-Webster, https://www.merriam-webster.com/dictionary/procedure (last visited Aug. 14,

---

[4] Given the devastating consequences of prolonged solitary confinement identified in the case law and scientific literature, and seen in Gallina himself, there is no question that this practice "disrupt[s] profoundly the senses or the personality." *See, e.g.*, *Porter*, 923 F.3d at 357 ("Prolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized," giving rise to "depression, withdrawal, appetite and sleep disturbance, fatigue and lethargy, and suicidal ideation."); *see also Ruiz v. Texas*, 137 S. Ct. 1246, 1247 (2017) (Breyer, *J.*, dissenting from denial of stay of execution) (noting that the petitioner "ha[d] developed symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty"); *Davis*, 135 S. Ct. at 2210 (Kennedy, *J.*, concurring) (noting that "common side-effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors"). The majority does not seem to challenge the notion that prolonged solitary confinement may be "calculated to disrupt profoundly the senses or the personality," 8 C.F.R. § 1208.18(a)(4)(ii), so I do not address this point more fully.

2020). This definition is the most historical one recognized by the dictionary.[5]

And prolonged solitary confinement can of course constitute "a particular way of accomplishing something," whether that be minimizing security risks or, as in this case, obtaining confessions and cooperation from prisoners.

The majority, based on the second sense of the word "procedure," argues that detention conditions cannot be considered a "procedure" and that it is far more likely that the term "other procedures" refers to discrete interventions like sleep deprivation or sensory overload. Maj. Op. at 16-17. As an initial matter, the question is not whether *detention conditions* broadly speaking can be considered a procedure—the question is whether *prolonged solitary confinement*, in the regimented fashion of the 41-bis system, can be considered a "procedure."

---

[5] This determination is made based on the dictionary's explanatory notes. The word "procedure" has multiple meanings. The first sense of that word is "a particular way of accomplishing something or of acting." *Procedure*, Merriam-Webster, https://www.merriam-webster.com/dictionary/procedure (last visited Aug. 14, 2020). The second sense is the one that the majority considers pertinent, that is, "a series of steps followed in a regular definite order." *Id.* It is with this second sense that the example of a surgical procedure is offered. *Id.* Merriam-Webster explains that the "order of sense within an entry is historical: the sense known to have been first used in English is entered first." *Division of Senses*, Merriam-Webster, https://www.merriam-webster.com/help/explanatory-notes/dict-definitions (last visited Aug. 14, 2020). In light of this, it is unclear why the majority's preferred definition is the "pertinent" one, when both definitions are equally plausible, and one is more historical. Maj. Op. at 16.

Additionally, while I do not doubt that sleep deprivation or sensory overload may be considered procedures, I, like the legal scholars who have taken up the issue, fail to see how prolonged solitary confinement is distinguishable from these interventions. *See, e.g.*, Luban & Shue, 100 Geo. L.J. at 848.

The majority contends that the canon of noscitur a sociis supports its interpretation of "other procedures" as limited to the above-referenced discrete interventions. But there is little analytical daylight between the application of mind-altering substances and the imposition of prolonged solitary confinement when both can result in severe mental pain or suffering, just as there is little to no difference between prolonged solitary confinement and interventions such as sleep deprivation or sensory overload. For these reasons, I would hold that under the plain text of the CAT regulation, solitary confinement can be an "other procedure[] calculated to disrupt profoundly the senses or the personality." 8 C.F.R. § 1208.18(a)(4)(ii).

**B. The Permissibility of Solitary Confinement**

The majority next argues that it is unlikely the agency intended to encompass an entire system of incarceration sanctioned by foreign law, particularly when similar detention conditions are permissible under domestic

law. The majority is not wrong to be skeptical of finding elephants in mouseholes, but I am unpersuaded. That a sanction is permissible under foreign law does not insulate it from a torture finding under the CAT regulation, as suggested by the live burial example in *Pierre* discussed in section I, *supra*.

In addition, the majority is incorrect in suggesting that similar conditions are permissible under domestic law. The Eighth Amendment does not sanction the imposition of prolonged solitary confinement on prisoners without a legitimate penological justification, and even then, prolonged solitary confinement for prisoners with known mental health issues violates the Constitution. *See, e.g.*, *Porter*, 923 F.3d 348 (holding that prolonged solitary-confinement conditions similar to those of Gallina's violate the Eighth Amendment); *Palakovic*, 854 F.3d at 226 (holding that solitary-confinement conditions less severe than Gallina's violate the Eighth Amendment when applied to a prisoner known to have mental health issues); *Madrid*, 889 F. Supp. at 1264 (holding that imposition of prolonged solitary confinement on prisoners with mental illness violates the Eighth Amendment even when imposed to prevent organized crime). [6]

---

[6] I also note that our Court has recognized that the First Amendment protects "a prisoner's right not to serve as an informant." *Burns v. Martuscello*, 890 F.3d 77, 81

## C. International Law's Treatment of Solitary Confinement

The final point the majority makes is that thus far, "no international tribunal or treaty body has found that prolonged solitary confinement, without more, rises to the level of torture as distinguished from CID treatment." Maj. Op. at 18. But the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment has explicitly said:

> [T]he practice of solitary confinement during pretrial detention creates a de facto situation of psychological pressure which can influence detainees to make confessions or statements against others and undermines the integrity of the investigation. When solitary confinement is used intentionally during pretrial detention as a technique for the purpose of obtaining information or a confession, it amounts to torture as defined in article 1 or to cruel, inhuman or degrading treatment or punishment under article 16 of the Convention Against Torture, and to a breach of article 7 of the International Covenant on Civil and Political Rights.

Juan Méndez (Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment), *Interim Rep.*, ¶ 73, U.N. Doc. A/66/268 (Aug. 5, 2011). As mentioned earlier, Gallina was placed in solitary confinement

---

(2d Cir. 2018). Thus, the imposition of solitary confinement to coerce cooperation from prisoners, as was done to Gallina, would also run afoul of the First Amendment.

before his conviction, spent a month in 24-hour solitary conditions, and was told that the purpose of this was to force his collaboration. This places Gallina's situation squarely in line with that described by the Special Rapporteur as constituting a CAT violation.

Furthermore, while no international tribunal may have found solitary confinement in and of itself to be a CAT violation, that is not fatal to Gallina's case. This case does not involve "prolonged solitary confinement, *without more*." Maj. Op. at 18 (emphasis added). Gallina was denied mental health treatment while incarcerated because he failed to collaborate with police. Given that access to health care is a fundamental right, *see Palakovic*, 854 F.3d at 226, denial of mental health treatment is analogous to other deliberate abuses that aggravate cruel, inhuman, and degrading treatment and can constitute torture, *see A.B. v. Russia*, App. No. 1439/06 ¶ 127 (Oct. 14, 2010), http://hudoc.echr.coe.int/eng?i=001-100964 ("[T]he lack of appropriate medical treatment in prison may itself raise an issue under Article 3, even if the applicant's state of health does not require his immediate release.").

It is true that the conditions of Gallina's detention were not as harsh as those in *Case of Ilaşcu and Others v. Moldova and Russia*, 2004-VII Eur. Ct. H.R. 179,

which involved complete lack of human interaction and reading material, as well as the deprivation of health care. But nothing in *Ilaşcu* indicates that the European Court of Human Rights sought to elevate the unique facts of that case into a legal minimum for CAT violations, as the majority seeks to do here. In fact, the court suggested the opposite. *See A.B. v. Russia*, App. No. 1439/06 ¶ 99 (Oct. 14, 2010), http://hudoc.echr.coe.int/eng?i=001-100964 ("[T]o fall under Article 3, ill-treatment must attain a minimum level of severity. The assessment of this minimum level is relative; it depends on all the circumstances of the case, such as the duration of the treatment, its physical and mental effects and, in some cases, the state of health of the victim."). Thus, even assuming that international law cannot support a holding that *any* prolonged solitary-confinement conditions constitute torture, that certainly does not counsel against a holding that Gallina's detention conditions constitute torture.

The crushingly isolationist conditions that Gallina endured, particularly in conjunction with his deprivation of mental health care and the coercive purpose involved in his specific case, is not subject to the lawful-sanction exemption and falls within the definition of an "other procedure[] calculated to disrupt profoundly the sense or the personality." 8 C.F.R. § 1208.18(a)(4)(ii). For the

reasons given above, I respectfully dissent from the denial of Gallina's petition for deferral of removal under the Convention Against Torture.